**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**In Re:**

**Leslie Howard Roberts, Jr.** **Case No. 11-39825 LMI**
**Silvia Castro Roberts,** **Chapter 7**
**Debtors.**
_________________________/

**Leslie Howard Roberts, Jr.** **Adv. Case No. 13-01140 LMI**
**Silvia Castro Roberts,**
**Plaintiffs,**

**vs.**

**Edmundo Gugliotta,**
**Defendant.**
_________________________/

**NOTICE OF FILING DEPOSITION TRANSCRIPT OF EDMUNDO GUGLIOTTA**

Come Now the Debtors, Leslie Howard Roberts, Jr. and Silvia Castro Roberts, and hereby file the transcript from the April 16, 2014 Sworn Deposition of Edmundo Gugliotta.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 30, 2014 a copy of the Foregoing Motion for Summary Final Judgment was delivered to Dirk Lorenzen, Esq. by email to eservice.lorenzenlaw@gmail.com.

Submitted by: /s/ Mark S. Steinberg

Signature
Mark S. Steinberg, Esq.
Florida Bar No. 883913
Attorney for Debtors
9400 South Dadeland Boulevard
Penthouse Five
Miami, Florida 33156
Telephone: (305) 671-0015
Primary email: mss@steinberglawoffices.com
Secondary email: mss25@juno.com

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-23550 CA 42

EDMUNDO GUGLIOTTA,

Plaintiff,

ORIGINAL

vs.

LESLIE HOWARD ROBERTS, JR. a/k/a "LES ROBERTS", et al.,

Defendants.

_______________________________________/

150 Alhambra Circle
Coral Gables, Florida
Wednesday, April 16, 2014
1:45 p.m.

DEPOSITION OF EDMUNDO GUGLIOTTA

Taken before MARIANNE TERTAN, Shorthand Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Certified Shorthand Reporters, Inc.
Miami • Ft. Lauderdale • West Palm Beach

APPEARANCES:

DIRK LORENZEN, ESQ.
of the firm Lorenzen Law, P.A.
on behalf of the Plaintiff

JASON M. WANDNER, ESQ.
of the firm Jason M. Wandner, P.A.
on behalf of the Defendants

ALSO PRESENT: Leslie Roberts
Sylvia Castro

I N D E X



| WITNESS | EXAMINATION BY | PAGE NO. |
|---|---|---|
| EDMUNDO GUGLIOTTA | MR. WANDNER | 3, 128 |
| | MR. LORENZEN | 121 |

Thereupon--

EDMUNDO GUGLIOTTA

was duly administered the following oath: Do you swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I swear.

- - - - -

DIRECT EXAMINATION

BY MR. WANDNER:

Q. First of all, Mr. Gugliotta, you said something earlier during the discussion that as a conscientious attorney I feel I need to present something to you before we begin. It is not really my job to do it but there it is.

You mentioned something about having some issues regarding a criminal matter. I'm not your lawyer, I am not privy to what other issues you may have other than the lawsuit before me and the bankruptcy matter, which you were a party to both. But to the extent you have indicated in this open forum today that you have some concerns about some criminal issues seemingly related to these issues, your words not mine, please understand that this is a sworn deposition and to the extent that

you answer the questions that I ask of you, which I hope you understand you must answer truthfully each and every one of them, each and every one of those questions and answers may be used against you in any proceeding, whether it be this proceeding, the bankruptcy proceeding or hypothetically in some criminal proceeding should it come to that.

Do you understand that?

MR. LORENZEN: One moment. When he commented about being involved in a criminal matter, it was not a criminal matter involving himself. It was a criminal matter involving other people present in this room. So your implication to the contrary in your long lead-in is something I needed to address.

That said, Mr. Gugliotta is fully aware of what the implications are of providing testimony. He fully intends to testify completely and honestly.

MR. WANDNER: Well, again, he mentioned something about having to get a criminal lawyer of his own. I think any reasonable interpretation of that is concern he may have with his own exposure.

MR. LORENZEN: That was not what he said. You are mischaracterizing what he said earlier.

MR. WANDNER: It is part of the record and I've given him my position and you are his lawyer, you've advised that he's aware of his rights. So be it.

MR. LORENZEN: And it was also during the time we had settlement discussion.

MR. WANDNER: No, that was absolutely not part of a settlement discussion.

MR. LORENZEN: Proceed with your questions rather than making statements for the record.

BY MR. WANDNER:

Q. So, Mr. Gugliotta, tell me, how long have you been involved in the art business?

MR. LORENZEN: Objection to form. You may answer to the best of your ability.

THE WITNESS: In the art business? What do you mean? Character of what, aficionado, collector or savvy?

BY MR. WANDNER:

Q. How long have you been interested in art?

A. Since I was nine years old maybe.
Q. And when was that, if you don't mind me asking? When were you nine, what year?
A. 1959, art in different forms, not only this one.
Q. Did you study art as a youth?
A. No.
Q. So your interest in it when you were nine was just as a nine-year-old interested in something new?
A. Probably.
Q. Did you ever study art as an educational field of study?
A. No.
Q. When did you begin to see art from a collector's point of view?
MR. LORENZEN: Objection to form.
You may answer. Just to be clear, I'll object to the form if I don't think his question is properly phrased. You can still answer the question.
THE WITNESS: Could you repeat the question?
BY MR. WANDNER:
Q. From when you were nine years old when

you started appreciating art, when did you start to appreciate art as a collector?

MR. LORENZEN: Objection to form.

You may answer.

THE WITNESS: Again, I don't find your answer (sic) very well-defined. Can you define what you mean by art? Can you be specific?

BY MR. WANDNER:

Q. What is art to you, sir?

A. Music, many other things, design.

Q. When did you start to appreciate art regarding music?

A. When I started appreciating music? I was around 13 years old, 1963.

Q. And how about musical theater? Did you ever become an aficionado of that?

A. No. I don't like it. It is not my genre.

Q. How about the art of literature, did you become an aficionado of that?

A. No.

MR. LORENZEN: Objection to form.

MR. WANDNER: He's the one that interposed a question as which art I'm

referring about so I want to make sure that I give him the full panoply of the art world so we make sure we're narrowing it into focus.

Q. How about movies? Do you like movies?

MR. LORENZEN: Objection to relevance.

Q. Movie art? Do you like that?

MR. LORENZEN: Objection to relevance.

THE WITNESS: I like it like anybody else.

BY MR. WANDNER:

Q. Now, do you like artwork on a wall, like that for instance right there? Do you like that kind of art?

A. It is not my style but I guess it is art as anybody else.

Q. Let's define it generally. What kind of art is that? I don't mean the style. I'm not asking if it is an impressionist or modernist or any of that. What kind of art is that?

A. I have no idea.

Q. Would you define that as a painting?

A. I have no idea. I need to touch it and see it, maybe look near it.

Q. Well, what different kind of art could that be?

MR. LORENZEN: Objection to tone of voice. You may answer.

Q. What different varieties of art could that thing that's stuck up on the wall be?

A. Well, that could be a real painting, that could be a lithograph, that could be a forgery of somebody very well-known. That could be a printout from a computer. I don't know.

Q. Now, all of those kind of artworks, is it defined in a manner that could be used one word when it is something that is up on a wall?

MR. LORENZEN: Objection to form.

Q. Whether it is a lithograph or original or anything like that, when it is up on a wall what do you call it in plain English?

MR. LORENZEN: Object to form.

THE WITNESS: I don't know. Decoration?

BY MR. WANDNER:

Q. That's decoration?

A. Probably.

Q. What about the one behind you, this lovely cabin on the lake? That's decoration, too?

A. Yeah.

Q. So that doesn't have any specific, defined kind of art? Is that what you are

suggesting, sir? It is not a painting?

A. I don't know if it is a painting.

Q. Does it look like a poster board?

A. I don't think so.

Q. So what does it look like on its face? What does it look like?

A. A house, a heaven, some trees.

Q. I don't mean what's on the painting. What is that big piece of thing on the wall?

MR. LORENZEN: Object to the form.

THE WITNESS: I don't know.

BY MR. WANDNER:

Q. You don't know what it is, sir? What is this here? What is this interesting piece of whatever that is? What would you call it in English?

MR. LORENZEN: Objection to form. What are you referring to when you say, "this"?

Q. This hard thing on the outside of this colorful part. What would you call that in English?

MR. LORENZEN: Objection to form. You may answer.

THE WITNESS: I think it is a frame.

BY MR. WANDNER:

Q. That's a frame. Okay. Now we're getting somewhere. What is this part that has the funky colors and the different things like the lake and cabin? What do you call that part?

A. I don't know, a depiction of a tree and depiction of a house.

Q. Like a scene of some sort. What do you call it when you take a depiction of something and frame it and you put it up on a wall?

A. Part of the decoration of a space, an ambient.

Q. No other words would describe that?

MR. LORENZEN: Object to form. I don't know what word you are looking for.

THE WITNESS: I don't know.

BY MR. WANDNER:

Q. Do you know what the Mona Lisa is?

A. What is it?

Q. You don't know what the Mona Lisa is, sir?

A. I know who did it.

Q. Who did it?

A. Leonardo da Vinci.

Q. What is the Mona Lisa?

A. It is a lady born in Italy.
Q. And isn't it something up on a wall in some museum somewhere?
A. Yes, I guess.
Q. What do you call that?
A. It is a picture.
Q. Not a painting?
A. Most probably it is a painting.
Q. Would you call it a piece of artwork?
A. Absolutely.
Q. Now we're getting somewhere.
MR. LORENZEN: Object to the form.
Q. Do you agree that the things on this wall -- how many walls are there in this room?
A. Including the doors and everything? I guess four, and the roof, five.
Q. And each wall there's these things hanging there, right?
A. Yeah.
Q. Can we agree even if these aren't as nice as the Mona Lisa they are basically the same kind of artwork?
MR. LORENZEN: Objection to form.
Q. Don't you agree?
A. No, I don't agree.

Q. What is the difference?
A. I don't know. They are completely different. One has a castle and the other one has some boats and the other one, I don't know.
Q. But they all have frames?
A. Yes.
Q. And they all depict something?
A. Yes.
Q. And they are all up on a wall?
A. Yes.
MR. LORENZEN: Object to the form.
Q. In your understanding and appreciation of the arts you can't figure out a word to describe the similarities between all four of these objects on the wall?
MR. LORENZEN: Objection to the form. You are arguing with the witness.
THE WITNESS: I don't know.
BY MR. WANDNER:
Q. Since 1959 have you come to appreciate depictions surrounded by a frame that's put up on a wall?
A. A few of them.
Q. Care to share those few that you've become an aficionado of?

A. I don't recall one specific.
Q. You don't recall one specific?
MR. LORENZEN: Excuse me, one moment.
(A brief recess was taken, after which the following proceedings were had:)
(Whereupon, the last question was read by the reporter.)
BY MR. WANDNER:
Q. Any specific artists you've become affectionate toward or that you appreciate?
A. I had a trip to New York when I was 18 and I had the pleasure to meet Peter Max when he was young. And since then I had some kind of -- I was, like, in the hippie ages and I liked what he did and I always had it in mind and I said to myself eventually one of these days I'm going to be able to have one of his paintings. He's one.
The other one would be Dali.
Q. Salvador Dali, that's the American way to say it. I'm sure the cultured folk across the pond say it a different way.
MR. LORENZEN: Don't interrupt his answer, please.
MR. WANDNER: He's done with his answer, right?

THE WITNESS: Yes.

BY MR. WANDNER:

Q. So can we agree that when we use the term art for purposes of this deposition we're discussing those kinds of things that go up on the wall?

A. If you want to be specific on that, yes.

Q. So you mentioned a man named Peter Max. And lo and behold, I'm actually looking at some stuff here related to Peter Max. Is Peter Max an artist, would you say?

A. Yes.

Q. Does Peter Max create art?

A. Yes.

Q. What kind of art does he create?

A. Starting when?

Q. From the beginning and infancy of his career.

A. You have an appointment at 3:15 you said? There won't be enough time so be specific.

Q. What kind of art? Does he do stuff on the wall?

A. He does many things. He does objects.

Q. Give me the short version. What kind of objects?

A. I don't know, decoration objects, sports objects, franchised objects which he created and sold. Paintings, lithographs, mix media; I can go on and on.

Q. Fair enough. So back in 1972 you became aware of him?

A. I met him, yes.

Q. You met him by chance or you knew about him before you met him?

A. I knew before him because he was very popular at that time.

Q. And you had some opportunity to meet him in person?

A. Yes.

Q. And you took that opportunity?

A. Yes, sir.

Q. And did you write about that opportunity?

A. I did a few times.

Q. Tell me when you did that.

A. I wrote about it in a blog that I have about Peter Max.

Q. So you have a Peter Max blog?

A. Well, it is not a Peter Max blog. It is a blog for collectors.

Q. And you run it?
A. I don't run it anymore. I did run it for a while.
Q. What is the blog called?
A. The Max Collector.
Q. And when did you run it from?
A. Well, I started when I met your client Les Roberts, and I had the opportunity to meet Peter again when he signed that image you have in front of you. And I said that I really wanted to start collecting Peter Max things. So the whole drive behind it was a meet-and-greet I had at the gallery in the Grove.
Q. So in 1972 you met Peter in person up in New York. Did you write about that meeting at the time?
A. Absolutely. That was, like, a very specific moment of my life. Nothing went beyond that.
Q. You didn't write an article about that meeting at the time?
A. No.
Q. Did you ever buy any Peter Max artwork at the time?
A. No. Maybe some souvenir, but I don't

recall exactly.

Q. Did he give you any artwork?

A. No.

Q. How long did you meet him for?

A. I took some pictures with him.

Q. And some of his artwork?

A. No. Well, I don't know if he was sitting down casually and some artwork was there.

Q. Did you ever hear of Runner in Red?

A. Yes. I took a picture that he had Runner in Red behind him.

Stop me when you want me to stop.

MR. LORENZEN: Will do.

Q. Between 1972 and when you met my client did you ever meet Mr. Max again?

A. No.

Q. Did you ever have any communication with him again?

A. No.

Q. Did you ever buy any Peter Max object at all? You mentioned some sort of this and that.

A. No. I totally forgot about it until I met him again.

Q. And what was it that led you to understand Mr. Max was going to be in Miami?

A. An advertising in the Miami Herald.

Q. And had you known Les Roberts before that advertisement?

A. No.

Q. Were you involved in any kind of artwork collecting or anything like that up until you saw that advertising?

A. No.

Q. So from 1972 until -- when was that advertisement?

A. I guess it would have been a few weeks before the meet-and-greet. The meet-and-greet was I think in May.

Q. May of what year?

A. May, 2010, I think, maybe, give or take two, three weeks before, maybe a couple of weeks before. And when I saw that I knew he was here in Miami and I said, Wow, that's a good opportunity to meet Peter.

Q. So between 1972 and the meet-and-greet you did not purchase or obtain any Peter Max related artwork or objects at all?

A. Not that I recall of.

Q. And between 1972 and the meet-and-greet did you purchase any kind of artwork at all?

A. Probably.
Q. What kind of artwork?
A. I don't know exactly. Probably I purchased some lithographs and some serigraphs.
Q. Would you agree that before the meet-and-greet you had already become a collector of artwork?
A. No.
Q. So you saw the advertisement. Did it have any specific names on it other than Peter Max?
A. I don't recall but I can get that information easy. I have it on file.
Q. Did it have Les Roberts or Sylvia's name on it?
A. I don't think it had specific names. It had a phone number.
Q. Did you call that number?
A. I called that number.
Q. Who did you speak with?
A. I spoke with Les Roberts.
Q. What did you discuss?
A. Nothing; I just found out the specifics of time because you needed to make a reservation.
Q. And did you reserve a spot at that meeting?

A. I did.

Q. And did you speak to Mr. Roberts again after that first phone call prior to the actual meet-and-greet?

A. I think I did but I'm not very sure. Maybe to confirm.

Q. Did you make any kind of -- did you visit the gallery prior to the meet-and-greet?

A. I passed in front of it but I didn't go in.

Q. What was the purpose of passing in front of it?

A. Because I used that road pretty often.

Q. So you passed in front of it driving your car or you actually stopped and walked in front of it?

A. No, I just passed in the car. I didn't even know the gallery existed before I saw the advertising.

Q. You said you may have spoken with Les before the meet-and-greet in order to confirm your reservation?

MR. LORENZEN: Objection to form.

You may answer.

THE WITNESS: Yes.

BY MR. WANDNER:

Q. Did you purchase any artwork or make any arrangements to obtain any artwork or view any artwork prior to the meet-and-greet?

A. I don't really recall. Let me see.

MR. LORENZEN: Object to the form.

THE WITNESS: I'm not sure if I maybe went to the gallery before the meet-and-greet. I'm not very sure, but I don't think so. I know that I bought a piece of art, a sculpture, but I don't remember when I bought that sculpture, if it was before or after the meet-and-greet.

BY MR. WANDNER:

Q. And what kind of sculpture is that?

A. A small statuette of the Statue of Liberty.

Q. Was it an original piece?

A. That's what Les Roberts said.

Q. Who was the maker of it?

A. The maker? Peter Max, and supposedly it was signed on the bottom.

Q. So this item you bought, you don't know if it was before or after the meet-and-greet?

A. I'm not very sure.

Q. It was a Peter Max Statue of Liberty?
A. That's what the owner of the gallery told me.
Q. Was there a certificate of authenticity associated with this purchase?
A. Not for that particular piece because he told me that it was a secondhand piece, that he had it just there for a friend, in that line.
Q. And he told you that before or after you purchased it?
A. In the process.
Q. How long did this process take?
A. I don't remember.
Q. Was it, Oh, I see it, here is my money, buy, or was there a negotiation over the purchase of it?
A. No. There's no negotiation. When I like something I look at it, I get the basic information. I trust the people I do business with and I buy it.
Q. Was there a paper bill of sale exchanged, that kind of thing?
A. Yeah, I think I have one of those.
Q. And you paid how much?
A. I don't remember; like, 900 bucks.

Q. Did you pay in credit? Cash? Check?
A. I think it was credit card.
Q. Under your name?
A. Yeah.
Q. Could be business name?
A. No. I think it was under my name.
Q. By the way, at that time when you first spoke to Les, the advertisement as the meet-and-greet was about to happen, what business were you involved in?
MR. LORENZEN: Objection to form.
You may answer.
THE WITNESS: 2010? I was in the construction business.
BY MR. WANDNER:
Q. Are you a licensed contractor?
A. No. I'm a developer. I invest.
Q. You are an investor in real estate development? Commercial or residential?
A. Residential.
Q. Do you own your own company?
A. Yes.
Q. What is your company called?
A. Euro Habitat.
Q. Are you still in that business?

A. Yes.

Q. Can you tell me some projects that you invested in?

THE WITNESS: Is that relevant?

MR. LORENZEN: Can you proffer the relevance?

MR. WANDNER: I don't have to proffer any relevance. Given your questioning of my clients about events that happened 30 years ago, you obviously have a wide range of relevance.

BY MR. WANDNER:

Q. Go ahead, sir.

THE WITNESS: Yes or no?

MR. LORENZEN: Go ahead.

Q. Can you describe some of the developments you are invested in?

A. Yeah. We purchase land, we build it and we sell it.

Q. Any specific projects?

A. Define that.

Q. These projects that you purchased land, build and then sell, do they have names associated with them, like Ikon?

A. Not necessarily.

Q. Some catchy Euro phrase to grab the eye of an overseas investor looking to stake their claim?

A. Not necessarily; not so much.

Q. So you buy a piece of land, put up a structure, sell it and let somebody else worry about that?

A. About what?

Q. Advertising it out to those that might be interested in purchasing.

A. No. It is my duty to sell it so I need to do a proper selling process.

Q. So none of these projects have a name that you could throw out there that I would recognize?

A. Not necessary.

Q. Give me an address. Tell me an address of one of these projects that you've been involved in.

A. You want an address? Yeah, I can tell you, 7330 Southwest 105 Terrace, Pinecrest.

Q. What was that?

A. It was a house.

Q. So, you are not talking about big buildings?

A. No.
Q. You are talking about just houses?
A. Single-family.
Q. I'm sorry. You understand what I'm talking about with these buildings --
A. That's why you wanted to know names? No.
Q. So you buy a little tract of land, you put a house up and you sell the house?
A. Yeah.
Q. Fair enough. Most of those houses do not have names. Of course, in Coral Gables, I'm sure Dirk's house has a name, Casa This, Casa Lorenzen? No? I digress.
So you are still involved in this industry?
A. Yes, sir.
Q. Do you have partners?
A. In one of them.
Q. In one of your companies or one of the projects?
A. One of the projects.
Q. That's one of your ongoing projects?
A. Yes.
Q. And in history have you had partners in

any other projects that you've been involved in or is it always just your money and your work?

A. I don't like partners very much so I might have had some but not consistently.

Q. Have you ever had any kind of problems with your development business that have caused you to have to stop that business or anything like that?

A. Define. Legally? Structurally?

Q. Anything like that; ever have any legal problems?

A. They are usually run-of-the-mill problems that you have in construction, nothing major.

Q. But you are not licensed in anything?

A. I don't have to.

Q. You have a contractor who is licensed to build the project?

A. Absolutely.

Q. So back to this Statue of Liberty. What if anything did you do to determine whether or not this particular piece of art that you bought was or was not an original piece?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Well, in my line of thought I didn't have to be very thorough because I was purchasing it at the place that was called was the name of the artist, and because either there was or there was going to happen a very well-publicized event where the artist was going to be present. So in my mind I would have taken it that everything that was inside there would be perfectly coherently in line with what the owner was offering.

BY MR. WANDNER:

Q. Prior to, again, that period of time where you talked to Les and the meet-and-greet and prior to the time you made your first purchase had you been aware that the art industry had particular problems with authenticity of artwork?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: I had read it in newspapers and even it was something very public.

BY MR. WANDNER:

Q. Even at that time?

A. I don't know exactly if I knew something

at that time, but there's been many cases of forgeries in history. So I'm sure it is nothing that is, like, Oh, how come? It is nothing new.

Q. So you would agree that even at the time you made your first purchase from Mr. Roberts that art industry has well-known incidents of unauthorized or forged artwork? You would agree with that?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Well, in my logic I would say it would happen to people who purchase from the wrong places at the wrong time and not following the proper procedures to validate what they are buying, yes.

BY MR. WANDNER:

Q. And what would be the proper procedures to validate what you buy?

A. Well, there's many things but upon further study of this matter I found out there are two or three things that you need.

Q. Okay. What are those?

A. Being the first one what's called provenance and provenance is basically where you buy from. So once you are pretty sure where you

are buying from, then you need to have a certificate of -- from the original creator of the piece and then you must have an invoice from the place where you purchase. Those three things, if those three things are properly done and obtained, then your chances of having something that is not a real piece of art, then you might get into trouble or you might be losing your money.

Q. If you don't have that, you could be in trouble? If you do have that, you're okay?

A. The chances are going to be higher.

Q. And you knew that, of course, prior to this first meeting with Mr. Roberts and this meet-and-greet, right?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Two of them I did; the third one I investigated and I found out.

BY MR. WANDNER:

Q. What were the first two again?

A. The first two is whatever I buy I get a certificate of origin and an invoice. That I got.

Q. The provenance was an issue you learned later on?

A. Provenance is an issue I learned later

on, but my basic logic forced me whatever I buy in art has to be bought from a place that is reliable and proven to be -- in the case of art I would say it is the dealer, let's put it that way. I would not buy a piece of art if it is not from somebody very well-known or very well recommended or very well established, that you know it will actually and legally represent the artist itself.

Q. Now, let me ask you this, sir: Provenance, in addition to the certificate of authenticity, what other information do you need to prove the provenance?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Provenance, per se, it is part of a thing. If you know where you buy from and it is a reputed gallery that it is proven it represents the artist, that is basically provenance.

BY MR. WANDNER:

Q. Have you ever bought any piece of artwork, and I mean any time up until today, have you ever bought any kind of artwork from anywhere other than a gallery?

A. I might have bought some pieces for fun

from some private, but without any intention of having it very sophisticated, maybe something on the line of decoration, not collection or serious.

MR. LORENZEN: For the record, he's indicated the lousy quality of artwork I have around my office.

THE WITNESS: No, no, I don't know what they are so I can't say.

BY MR. WANDNER:

Q. How about on eBay? Have you ever bought anything on eBay?

A. Yes. I bought many pieces on eBay after May 15th.

Q. After May 15th, what?

A. Of 2010, after I started collecting Peter Max.

Q. Well, you would agree eBay is certainly not the same as buying from a gallery?

A. Absolutely.

Q. Is it better buying on eBay than a gallery?

A. No, absolutely not.

Q. So you understand buying from eBay you are not going to get the same protection as you indicated you need to, yet you bought from eBay

nonetheless?
A. Yes.
Q. Why?
A. Because you don't have a provenance and unless they have some relationship to some galleries and things and they have the real paperwork, that's a risk you are taking.
Q. And you are willing to take that risk --
A. I was willing and I am willing to take that risk if it is something insignificant.
Q. What is insignificant in the world of art?
A. Stupid things, collectibles, a baseball, a figurine, a watch, a belt, maybe a small piece, small mixed media, cheap piece.
Q. So even if somebody is advertising something as being an original, if it is small and insignificant you will buy it regardless of whether it has an established provenance or certificate of authenticity?
A. Well, you are mixing one thing with another one. Provenance, certificate of origin and invoice goes related to a very expensive piece of art. You don't buy a phone and for a certificate of origin, but if you buy a piece which is from a

reputed artist, then those three things trigger.

Q. So before you bought your first piece from Mr. Roberts or his gallery you made sure that you had a bill of sale and the certificate of authenticity, right?

A. In a few of the things I usually did those three things. One of them, unconsciously but following my logic, which is the provenance. I usually bought things from reputed places.

Q. So how many pieces would you say you ultimately bought from Mr. Roberts and his company?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Pieces, including collectibles?

BY MR. WANDNER:

Q. Everything.

A. I bought a few things.

Q. How many pieces?

A. I don't know exactly; a few. Besides the canvases?

Q. Let's stick right now with what is contained in the Complaint.

A. The canvases? It is nine or ten? Eleven including the --

MR. LORENZEN: I'm not allowed to answer any questions.

THE WITNESS: I don't know, but I think it is 11 canvases, including one I bought during the meet-and-greet.

BY MR. WANDNER:

Q. So at the time of the meet-and-greet -- so the canvas you bought at the meet-and-greet, you think that was the second thing you bought from him but maybe the first?

A. I should check on that but it is either the first or the second, including the statuette.

MR. LORENZEN: Object to the form of the last question.

Q. And subsequent to that you think you bought 10 other canvases?

A. Yes.

Q. And by canvases we mean that nice image you frame and put up on the wall, right?

A. That supposedly were hand-painted by the artist.

Q. So those 11 you understood to be originals made by the artist himself, right?

A. That I understood?

Q. You were under the impression they were?

A. I was under the assurance that they were.

Q. Who assured you of that?

A. Les Roberts, the owner of the gallery.

Q. And in all 11 of those instances were there certificates of authenticity or certificates of origin or whatever you want to call it that were associated with each and every one of them?

A. I got some papers that were supposed to be, yes.

Q. You got them before, during or after the purchase?

A. Usually it was after.

Q. So you purchased them without that document?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Well, yes, because according to Mr. Les Roberts it took sometime for the office, studio or from Max to send them via mail or via Fed Ex or whatever. So there was a span of time between the actual purchase of the art piece and the receipt of the certificate.

BY MR. WANDNER:

Q. How long was that gap?

A. It depends. Sometimes it was a week, sometimes it took, like, a month.

Q. But each and every one of them you got that certificate?

A. Yes.

Q. Did any of them have a certificate there when you bought it?

A. I don't remember but I don't think so.

Q. Not a one of them?

A. I don't think so.

Q. Did that not raise some cackle in your view of things that --

A. Absolutely not, never.

Q. Why is that?

A. Because I'm going again to provenance, I'm buying from a certified gallery that has had a show with a painter embracing, kissing and hugging everybody in the gallery, including the owner. So why should I be worried about it?

Q. Let's get to that.

A. I'm not the kind of man that thinks that everybody acts in bad faith.

Q. Let's talk about the meet and greet.

Were you alone or with somebody?
A. No, I was with my wife.
Q. And who else was there?
A. What do you mean?
MR. LORENZEN: Object to the form.
Q. Who else was there that you knew?
MR. LORENZEN: Object to the form.
Q. Was Peter Max there?
A. Yes, Peter Max was there. I met the general manager of his office.
Q. Peter Max' office?
A. Yes, Mr. Gene Lunds, and I met two of the representatives of the road show, the guys that are in charge of doing their shows.
Q. Whose shows?
A. Peter Max' shows in the galleries, in the authorized galleries. And I think I met --
MR. WANDNER: Hold on one second.
(A brief recess was taken, after which the following proceedings were had:)
BY MR. WANDNER:
Q. So was Les and his wife there?
A. Yes.
Q. And Peter Max was there?
A. Yes.

Q. Was he there with a wife, girlfriend?
A. No idea. He was with a whole bunch of people.
Q. So he had his whole road crew there, a whole road show?
A. Well, I don't know specifics. I mentioned those that I met. I met one salesgirl, I'm not sure if it was related to Les or to the studio.
Q. Now, was there any Peter Max artwork in the gallery?
A. Yeah, it was filled.
Q. Filled with Peter Max?
A. As a matter of fact, Les made a space he had. He used it for extra Peter Max art.
Q. Was there any other artists' work there at the time of the meet-and-greet?
A. I don't remember. I'm not very sure if there were other artists. I don't remember now. I don't know if Les for that event removed it because he needed more space.
Q. But for that particular event when Peter Max and his whole road show was there, it was filled top to bottom, head to toe with Peter Max artwork, right?

A. Yes, sir.
Q. And Peter and his road show, this was open and notoriously out so Peter could look and see everything that was there if he wanted to see it?
A. Yeah, absolutely.
Q. And his business manager and all his other cronies, if they wanted to get up in the thing and look and see exactly what's there with a little micro -- what shoe is she wearing or what color of the tree leaf and all that other kind of stuff, they could have done that, right?
A. Technically?
Q. Technically.
A. Yeah.
Q. And in fact, you wrote an article about this wonderful meet-and-greet, did you not?
A. Yeah, I did.
Q. And this was in The Grove Hot Spot magazine, June and July of 2011, right?
A. Yes, sir.
Q. And you have some wonderful pictures of back in the good old days, your meeting in '72?
A. Yes.
Q. And Mr. Max was sort of chilling out and

lying around looking very hippie-like under one of his Runner in Red pieces?

A. Yeah.

Q. And there is one picture that appears to be more modern? Do you see that one?

A. Yes.

Q. Was that done at the meet-and-greet?

A. By then, yes.

Q. At Les' gallery?

A. Yes.

Q. Who took that picture?

A. One of their certified photographers; they didn't let anybody take pictures.

Q. Is that your wife?

A. That's my wife.

Q. That older guy is Peter Max?

A. Well, there's two older guys there. I don't know which one you are talking about.

The one in the middle?

Q. The one that looks like he's lounging around back in '72, same guy, right? Put on a few years.

A. Yeah.

Q. And that's you?

A. Yes, the other old guy.

Q. Do you see what's right in the background there?
A. Yeah.
Q. What is that?
A. That's a Statue of Liberty canvas.
Q. You bought a Statue of Liberty?
A. I did.
Q. But not a canvas, alas.
A. No, a canvas.
Q. You did? I thought it was a --
A. No, that's another one.
Q. You bought a Statue of Liberty canvas, too?
A. Yes, sir.
Q. That same one in the back of that picture?
A. Yes.
Q. You bought that one? That's on your wall now somewhere?
A. Yeah, it is in my house.
Q. And that was literally within arms' length of the man himself, right?
A. (Nods in the affirmative).
Q. If he wanted to go beneath you and check out the entire color scheme and the yellows and

whites and shades and this and that, he could have done that, right?

A. Well, he did, as a matter of fact, because he signed it in the back.

Q. Peter himself signed that?

A. That's the fourth proof of...

Q. When he does it in front of you it is like a notary, right? You can't get any better than that, right? Too bad we didn't tie him down for all 11 canvases. But it seems to me, sir, the fact that Mr. Max was there seems to suggest that pretty much everything there was something that came from his loins, so to speak.

MR. LORENZEN: Object to the form.

Q. Wouldn't you agree?

MR. LORENZEN: Object to the form.

You can answer.

THE WITNESS: At that point I was not prepared to understand what was going on.

BY MR. WANDNER:

Q. But at least on the face of it, what you are suggesting in your testimony is, Hey, the man himself is here. What more proof do I need that this is legit stuff, right?

A. Yeah, of course. But that's not what

you said before. I cannot vouch and I didn't know the origin of all the others.

Q. I didn't ask that. What I'm suggesting is the fact that Mr. Max was there and walking around and touching and looking and surrounded by his children, so to speak --

A. He's surrounded by the people. He doesn't touch much and look much.

Q. But he's the one that supposedly makes it?

A. Yeah.

Q. Now, you know, I do appellate work, appellate work is like appeals. You know what that is, right, in the legal world?

A. No.

Q. You don't know what an appeal is? When you lose in the trial court you appeal and there's big brief writing. I'm sure Mr. Lorenzen has birthed a few appeals in his day. It is hundreds of hours of painstaking work until you prepare this beautiful document set forth with citations to the record and you send it out to the Appellate Court and you pray to God for your client that you win and each and every one of them is like a child to its author. Do you understand?

MR. LORENZEN: Objection to form.
You may answer.
Q. It is sort of like an artist with his original pieces, wouldn't you agree?
MR. LORENZEN: Objection to form.
THE WITNESS: I don't know. If you say so. It is your line of business. I don't know about your line of business.
BY MR. WANDNER:
Q. Are you an artist?
A. No, I'm not an artist. I'm an aficionado.
Q. Have you ever created a piece of art?
A. Not created, per se.
Q. Is there another type of creation?
A. Well, yeah, you can do some homages maybe and some renderings, but not for commercial purposes.
Q. We'll get to all that. I guess what I'm getting at here, is there any other person out there that could vouch for the authenticity of a certain piece of art than its author or creator?
MR. LORENZEN: Object to the form.
You may answer.
THE WITNESS: I don't know. I guess

there should be some specialized people that can do it if they know about the artist.

BY MR. WANDNER:

Q. So you are saying Peter Max would not be the most vital person in the inquiry as to whether or not it is an original Peter Max?

A. Yes, because in this case every canvas supposedly has a serial number and they should match their files.

Q. So the other 10 canvases other than Lady Liberty here, were they also in the gallery at the time of the meet-and-greet?

A. I don't know. I don't remember but I don't think so.

Q. Not a one of them?

A. I'm not very sure but I don't think so except maybe Cosmic Runner, which is --

Q. This one right here?

A. I think it is that one. I don't know if it is that one in particular but it is very similar to that one.

Q. And you bought that during the time of the meet-and-greet or soon after?

A. After.

Q. How long after?

A. A few days.
Q. And the other nine, how long did it take you to buy them?
A. Like, in the process of maybe a year.
Q. So you can't say with any degree of certainty whether any of the other nine were or were not present in the gallery at the time Peter Max was there?
MR. LORENZEN: Object to the form.
You may answer.
THE WITNESS: Except the Cosmic Runner, I'm not sure.
BY MR. WANDNER:
Q. You can't say no, you can't say yes?
A. Exactly. It would be unfair to say different.
Q. Of the 11 pieces of art that you, the canvases, let's stick with those, that you bought, that you testified you bought from Les or his company, do you know right now as you stand here today where they originated from?
A. If I know as a fact or what I was told?
Q. First as a fact, then what you were told.
A. As a fact, I don't know. Supposedly

they were supposed to be originated at Peter Max' office because supposedly he's the only one that does the canvases and signs the canvases. So if we start by that, he's the original creator. From where were they obtained, I'm not very sure but a few of them I think they were from a sale from a gallery that was closed. And the other ones, maybe they were obtained by other gallery owners. But most of them, supposedly they were sent by the Max office itself because he got continuously new collection of canvases on a regular basis. So I cannot say exactly which one is what.

Q. That's what you understood in terms of what he told you or what the normal process would be?

A. Well, not only what he told me but after a few -- after a period of time which we already did some regular business, it was pretty evident because he had a turnover of goods that were there and then they were not anymore. So presumably they were sold. He got always new stuff and when he got new stuff he always told me, I'm getting new stuff.

Q. And you understood or believed he was getting them directly from Peter Max headquarters?

A. If you asked me today I would say 101

percent, yes. I blindly believed they were from Peter Max.

Q. From his words or you just figured?

A. Well, from his words and I had certificates.

Q. And when you got each certificate, did you do any followup as a result of that certificate?

A. No.

Q. Did you call up Peter Max directly and say, Hey, I got a certificate, I just want to make sure that this is kosher?

A. I blindly believed what the owner of the gallery told me.

Q. You could have done that, right? Nobody stopped you from doing that?

A. I don't think so. I'm not very sure the gallery will willingly give you that information.

Q. The Peter Max headquarters?

A. Yeah. They might but I don't know.

Q. By the way, let me ask you a question. This Lady Liberty, is this part of our case today?

A. What do you mean?

Q. Is this part of the lawsuit?

A. No.

Q. It is not part of the lawsuit?
A. No.
Q. So how many canvases are part of this lawsuit? You mentioned 11.
A. I think it is 10 more. Either nine or 10, I'm not very sure.
Q. So, I'm asking, what canvases are you suing about? Not this one?
A. Not that one.
Q. How many are you suing about?
A. Either nine or 10.
Q. So this is the only one you are not suing about?
A. I'm not suing about that.
Q. Why is that?
A. Because the FBI told me that was the only original one.
Q. That was the only original one?
A. Not only the FBI; we also got an e-mail from the Max office.
Q. From who?
A. The Max studio office.
Q. And this is the one he signed the back of it?
A. Yes, sir. That would have been very

peculiar if he said that one...
Q. So this picture, this is Max, as well, same guy, right?
A. Yes, sir.
Q. Who is that other guy?
A. I think it is a major. He's a politician.
Q. Was he there at that event, too?
A. I didn't see him. Maybe he was there another day, not that day.
Q. Was this taken, this photograph?
A. It wasn't taken by me.
Q. But this was taken the day of the event?
MR. LORENZEN: Object to the form.
THE WITNESS: I'm not very sure.
BY MR. WANDNER:
Q. Let's look at the outfit you were in with Mr. Max in front of Lady Liberty. Do you see the outfit?
A. Yes.
Q. It is a brown jacket, right?
A. Yes.
Q. And sort of funky-looking sweater?
A. Yes.
Q. With a white shirt underneath, right?

A. He usually dresses that way always.
Q. Same outfit?
A. Yeah. It is weird, I know.
Q. The person who does his laundry must be very overworked.
A. No, he does it.
Q. And the picture you mentioned that you purchased is right behind you?
A. I'm not sure but it is very similar to that.
Q. This picture with Mr. Regulato and Mr. Max and he has something in his hand, what is that? Some sort of an award?
A. It is a key, the Key to the City maybe.
Q. Oh, brilliant. That may have taken place at the same time, right?
MR. LORENZEN: Object to the form; calls for speculation. You may answer.
Q. It is a reasonable deduction?
A. It is a reasonable deduction, yes, sir.
Q. And let's assume for the sake of argument the other piece that you talked about that you bought that looks like this one here, that's right with Mr. Max in the background, right?
A. Yes.

Q. And you are suing about that piece, right?

A. Yes, because that same piece the FBI agent that came, who is a specialist, told me it was not that piece, so I don't know who to believe.

Q. Do you remember the FBI agent's name?

A. Yes, sure.

Q. What is his name?

THE WITNESS: Can I disclose that?

MR. LORENZEN: Yes.

THE WITNESS: Robert Gilty? Gitzy?

BY MR. WANDNER:

Q. Robert Gilty? That's a heck of a name for an FBI guy.

A. I don't know exactly how it is spelled.

Q. And he told you about all the fake art and this is why there's a lawsuit, right?

A. He was pretty serious, yeah.

Q. And he told you specifically that piece of art in this picture was a fake?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: No, the one I had.

BY MR. WANDNER:

Q. The one you had. But it is definitely

the same?

A. No, that's the problem. I'm saying that it is similar. I cannot --

Q. And you bought it three days after the meet-and-greet, right?

A. Maybe a week; between three and a week.

Q. Did you see this at the meet-and-greet?

A. Yes, I did.

Q. Were there any others like it?

A. I don't know if it was that one or which one but it was similar, similar in size and similar also maybe in frame.

Q. Was there more than one there?

A. Of that? I don't remember. I don't think so.

Q. The one you have, does it have the same frame?

A. I don't know. That picture is not very clear.

Q. Tell me about the one you have. What framing does it have?

A. I don't know. They are black frame made of wood.

Q. Looks like that one?

A. Pretty much.

Q. For the sake of argument, let's just assume, and you are not admitting anything, for the sake of discussion, if this was the actual piece you purchased from Mr. Roberts merely three days after this meet-and-greet and the FBI guy a couple of years later says it is not really an original, well, the fact Mr. Max was standing right there, that certainly some questions and doubts in your mind as to what's going on here, right?

MR. LORENZEN: Objection to form; assumes facts not in evidence. He already testified that's not the same one.

MR. WANDNER: He didn't testify. He said he didn't know. And I'm saying let's assume for the sake of argument, okay?

MR. LORENZEN: You can't ask him to make an assumption that is belied by the facts.

BY MR. WANDNER:

Q. The fact is Mr. Max is right in front of that painting; is he not?

A. He's in front of one painting.

Q. And you have no idea in the world if there's another one like that, do you?

A. I can tell you something.

Q. Please do.

A. Many times he takes a theme and he does different versions of one theme. That one, the Cosmic Runner is a theme. So maybe there is a few Cosmic Runners.

Q. All originals?

A. All originals, but it is very tough for them to be exactly the same.

Q. Would he be able to know the difference you think?

A. Him? I don't know. Beats me.

Q. The fact of the matter is, he's standing right in front of the piece. If this particular one on the wall is a fake, he certainly should know it, right?

MR. LORENZEN: Object to the form.

THE WITNESS: I'm not very sure if he's into that nowadays. I think most probably he has someone who takes care of that.

BY MR. WANDNER:

Q. Takes care of what?

A. When he goes to a meet-and-greet, whatever is in the wall. I'm not very sure. I don't know.

Q. By the way, where is that painting, the one you bought three days later? Where is that?

MR. LORENZEN: Object to the form; he said three days to a week later.

THE WITNESS: I don't know exactly the time. It is not exact.

BY MR. WANDNER:

Q. Whatever. Where is it now?

A. What do you mean, where is it?

Q. Is it in your house?

A. It is in my house in the garage because I can't do anything with it.

Q. Could you take a photograph of it?

A. I mean, if the FBI says it is okay, I could. I cannot do anything that will hinder their investigation.

Q. Did you get any kind of communication regarding that particular --

A. It was part of the group.

Q. But you would agree, sir, if this was a fake Mr. Max would be the most important person to determine it was a fake, right?

A. I cannot agree to that.

Q. You can't?

A. I cannot. I'm not sure. I think probably the size of his outfit and the popularity he has and how his operation goes nowadays, maybe

he doesn't do much of the things he once did.

Q. In other words, you think there are other people out there creating Peter Max artwork?

A. Not creating; they are taking care of business. They have a manager, someone that takes care of business.

Q. And they were all there, you said. The whole road show was there.

A. I didn't say that. I said there were people representing Peter Max. I don't know who they were.

Q. Well, you would think one of their crew would be able to look around and say, Well, that looks fake and that looks real?

A. I don't know if that's a position that he cherishes.

Q. In other words, you don't think he cares whether the stuff on the wall is original or not?

A. I don't know if he cares or not. Maybe he doesn't care. I think he's not worried about it.

Q. So you weren't worried about it. If he's not worried, why should you be?

MR. LORENZEN: Object to the form; arguing with the witness. You may answer.

THE WITNESS: Of course I wasn't worried. To me, he's there and he is signing things...

BY MR. WANDNER:

Q. Then it is kosher, right?

A. It should be.

Q. Let me ask you a question. This handsome, dashing devil to my left, who is that?

MR. LORENZEN: Objection, mischaracterizes the evidence.

Q. Who is this guy to my left?

A. That's Roberts.

Q. Les Roberts, and he was there that day, too, right?

A. I don't know that day.

Q. He was there at the meet-and-greet, right?

A. At one of the days; I was there one day.

Q. He was there the day you were there?

A. The day I was there, yes.

Q. And this is his gallery?

A. Yes.

Q. And these were artwork he was putting on the wall?

A. Yes.

Q. And Peter was there in all his glory, right?

A. Yes, and he introduced me to him.

Q. The same core belief that you had that you were walking around with all these beautiful things and the man himself who created them was joining in that moment, do you think this guy had the right to have that feeling, too?

MR. LORENZEN: Object to the form.

Q. Mr. Gugliotta, sir?

A. What do you want me to do?

Q. I want you to tell the truth.

A. I'm not a psychologist. I don't know.

Q. You were talking about your own psychology. Let's talk about his.

A. Ask him, put him here and you can ask him.

Q. If Mr. Roberts obtained those 10 canvases from a place he believed made them an original from Peter Max' hands himself, and Peter Max was good enough to come down and saunter around his store giving the primature of validity such that you would rely upon that in your decision to purchase, don't you think he should have been able to rely on that same thing that what he was selling

was as valid as what you were purchasing?

MR. LORENZEN: Objection to form; assumes facts not in evidence. Assumes facts contradicted by the documents produced. And you are calling upon him to speculate as to your client's mindset.

MR. WANDNER: Counsel, you asked 100 questions about did somebody this and did somebody that and shouldn't he have relied, so your objection is noted.

BY MR. WANDNER:

Q. I want you to answer my question, Mr. Gugliotta.

A. Say it again.

Q. If you believed that these -- did you believe that the things on the walls were originals?

A. Yes, sir.

Q. And that was because of everything we discussed so far, most importantly of which Mr. Max was standing right there?

A. Yes, sir.

Q. Didn't Mr. Roberts have the right to rely upon that himself?

MR. LORENZEN: Objection to the form;

no.

MR. WANDNER: You know what, counsel? You are not the deponent.

MR. LORENZEN: You are assuming facts not in evidence.

THE WITNESS: That question has an answer that's maybe a little complicated.

BY MR. WANDNER:

Q. Please, complicate life for me.

A. Most of the pieces of art there for the meet-and-greet, on the third day they were not there anymore. They were removed and taken back to God knows where by the road show. So I don't know how many pieces remained there. I don't know how many pieces that night were sold, except that Les told me mine was one of the few that sold and that's why he had me like a good customer and was willing to treat me right. But the rest of the things, they weren't there the third day. So whatever started coming back of Peter Max canvases and things, I don't know their provenance.

Q. You don't know what he knew about their provenance, either, do you?

A. I don't know.

Q. So let's just assume again, you don't

know so you can't deny --

A. I know as a fact when I went there two, three days, a week later, I would say 80 percent of the things were not there anymore.

Q. But sooner rather than later other stuff was there that you later purchased?

A. Not in the same amount but they kept coming and going.

Q. And they all looked the same to you, right?

MR. LORENZEN: Objection to form.

THE WITNESS: To my naive eyes, yes.

BY MR. WANDNER:

Q. They all looked the same?

MR. LORENZEN: Object to the form.

THE WITNESS: Well, similar.

BY MR. WANDNER:

Q. How long had Mr. Roberts been in the art business, do you know?

MR. LORENZEN: Object to the form.

Q. At that point.

A. I don't know but I believe since he stated that he studied in Julliard and I believed that he started when he was a youngster, he had a few years in the art business.

Q. A few years?
A. A few years.
Q. Would you say your knowledge of Peter Max was the same or similar, or did you have more knowledge of Peter Max than he did?
A. He should have more, more.
Q. Even though you've known Peter since 1972?
A. I knew him only for a brief moment. I didn't get into his history.
Q. Again, you do not know where any of those 10 or 11 canvases came from, right?
MR. LORENZEN: Object to the form.
You may answer.
THE WITNESS: I don't know as a fact. I just know what Les told me.
Q. What Les told you was that --
A. A few of them, like two or three of them, three or four supposedly came from a gallery that closed because they were run by a couple in Tampa that they divorced and they had to split all the assets and he managed to buy at a very good price a few canvases and a few smaller pieces.
Q. And the rest?
A. And the rest I don't exactly know where

are they from.

Q. So he didn't tell you where the rest came from?

A. Well, I never asked. I thought besides the Tampa stuff that came to the gallery, the other ones were directly or indirectly from the Max studio.

Q. And you cannot standing as you are today contradict any of that which he told you in terms of where they came from, right?

A. I'm sorry.

Q. You have no proof at all whether or not he got those 10 or 11 canvases from those places he said he did?

A. I don't know which gallery was he talking about. I don't know the provenance of the other pieces he sold me. If they are not from the gallery, from the studio itself. And recently we got some e-mails where I found out that he purchased a few pieces from another gallery called Gallery Art in Aventura Mall. I have not been able to --

Q. Some of the pieces?

A. I don't know if they are my pieces because I don't have the serial number.

Q. Let's assume they are.
A. Because I don't have the serial number from the invoice.
Q. Let's assume they are.
A. I don't assume anything. I can't.
Q. Well, if he bought pieces from a gallery he should have been able to assume like you did that the provenance was legitimate, right?
MR. LORENZEN: Object to the form.
Q. Right?
MR. LORENZEN: Object to the form.
You may answer.
Q. Right?
MR. LORENZEN: Object to the form.
THE WITNESS: Yes.
BY MR. WANDNER:
Q. So let's assume all 10 or 11 pieces Mr. Roberts got were either from a gallery or from Mr. Max directly, you would agree he would be able to accept the provenance as being valid, correct?
MR. LORENZEN: Objection to the form. Assumes facts not in evidence. There's no factual basis for the assumption.
MR. WANDNER: He testified as to where he told him they came from, and he testified

about an e-mail he saw, and he testified as to what his assumption is about where they came from. All of that is now in evidence. He testified about it.

MR. LORENZEN: He testified as to his assumptions. You are asking him to assume that the representations made by your client who has just taken the Fifth Amendment as to all of these questions are accurate, and my client is not going to assume that the representations made by your client are accurate.

MR. WANDNER: I'm asking questions based upon his testimony. You can make your objection. Make your objection and let me move forward.

Do you want to make your objection?

MR. LORENZEN: I did. I object to the form of the question. It assumes facts not in evidence.

BY MR. WANDNER:

Q. You have no evidence to contradict what he told you where he got the 10 or 11 canvases he sold you, correct?

A. It is only what he told me. I don't

exactly know if it was true or not.

Q. You don't believe that Mr. Roberts has any specialized knowledge that he would be able to discern the difference between an original and non-original piece of Peter Max artwork, do you?

MR. LORENZEN: Objection to form. You may answer.

THE WITNESS: Well, I don't know. If we put logic before anything else, an individual that studied in Julliard and has 34 years in the business should have the capacity of knowing the difference between one and the other.

BY MR. WANDNER:

Q. Really? And how long does it take do you think for the galleries themselves to determine whether something is or isn't original?

MR. LORENZEN: Objection to the form; calls for speculation.

THE WITNESS: What do you mean, the galleries themselves?

BY MR. WANDNER:

Q. The manufacturers; there's a process, isn't there?

MR. LORENZEN: Objection to form.

THE WITNESS: What process?
BY MR. WANDNER:
Q. You said you got an e-mail from Peter Max saying that one certain piece was not original, right? Is that true?
A. Yeah.
Q. And how long did that take?
A. A week.
Q. Took a week?
A. Yeah.
Q. From the time you requested to the time they e-mailed you took a week?
A. Because they didn't need to see the picture, didn't need to touch it. Just simply the serial number didn't match.
Q. But Les Roberts is such a genius in artwork that he should be able to look at two pieces and be able to determine when one is a fake and one is not? Is that what you are suggesting, sir?
A. No.
Q. So he shouldn't be able to?
MR. LORENZEN: Object to form.
THE WITNESS: I'm not suggesting.
Q. Isn't that what you just testified, that

because he went to Julliard when he was a kid that should give him some special power?

MR. LORENZEN: Objection to form; assumes facts not in evidence and you are arguing with the witness.

BY MR. WANDNER:

Q. You believe because he went to Julliard that he has some special Wonder Twins power to determine the difference between an original Peter Max and non-original Peter Max?

MR. LORENZEN: Object to the form. There's no Wonder Twins power. You may answer to the best of your ability.

THE WITNESS: You are addressing your question with a different frame. I didn't say that.

BY MR. WANDNER:

Q. I said a piece of art.

MR. LORENZEN: Let him finish.

THE WITNESS: I admire that of you. But bottom line, I'm assuming I'm not a specialist and I don't know anything about --

BY MR. WANDNER:

Q. So you don't know --

MR. LORENZEN: He's in the middle of

answering and you are jumping on his words.
Stop doing that, counselor.
BY MR. WANDNER:
Q. Go ahead, Mr. Gugliotta. Finish what you have to say.
A. I assume, but why do I assume it? I assume it only based on logic. If someone goes to an art college and is working on an art business they probably should know what they are doing. I'm not saying that they do. They might be only just doing it for business and they don't know nothing.
Q. How about a collector, sir? Should a collector know what they are doing?
MR. LORENZEN: Object to the form.
THE WITNESS: Not necessarily; they are a collector, they have three or four points covered. That's as much as they need to know.
BY MR. WANDNER:
Q. So you should be able to go out in the world of art and be ignorant, but Mr. Les Roberts, he's not allowed to be ignorant? Is that what you are suggesting, sir?
MR. LORENZEN: Objection to form.
You may answer.

THE WITNESS: I didn't suggest that.
You are suggesting that.
BY MR. WANDNER:
Q. So he's allowed to be ignorant?
A. I don't say he's allowed to be ignorant.
Q. Are you allowed to be ignorant?
A. I might.
MR. LORENZEN: Object to the form.
Q. The bottom line is, sir, if there's Peter Max pieces of art on the wall and Peter Max is standing there, wouldn't you agree that even somebody who owns a gallery, it would be reasonable for them to believe in lieu of any other evidence, that they had some knowledge of falsity, that what is on the wall is original? Don't you think?
MR. LORENZEN: Object to the form.
You may answer.
THE WITNESS: Of what was present the day of the meet-and-greet, those two days, yes. After those two days, I don't know.
BY MR. WANDNER:
Q. But even after those two days, those pieces you later purchased you believed looked for all intents and purposes like originals, right, to your eye?

A. To my not knowledgable eyes, yes.

Q. Okay. After the meet-and-greet you said it took about a year for you to purchase these other items, right?

A. In different stages, yes.

Q. Now, is that about the same time you started running the Max In The Grove website?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: It was in between.

BY MR. WANDNER:

Q. So during the period of time that you were buying these 10 or so canvases, during that same period of time you started running the Max In The Grove website?

A. It was a process. It was a process.

MR. LORENZEN: Object to the form.

THE WITNESS: It was a process, not only of business but it was also a process of trust and friendship.

BY MR. WANDNER:

Q. And with who was that?

A. With Les Roberts.

Q. So you were in that process during that year of buying Peter Max art, you went into

business with him?

A. I didn't go into business with him. I helped him do a few projects that he had.

Q. Including this blog?

A. No. The blog is my blog. It has nothing to do with him.

Q. Now, the blog is called what, Max In The Grove website?

A. No.

Q. What was the blog called?

A. The Max Collector.

Q. What about the maxspace.com?

A. The maxspace was a website that we talked about doing eventually that would have helped the gallery be more popular, and it would have been good for him to move some pieces. And it was, like, good to have a website that was different to all the others. And since we wanted to do something good because Peter Max was, like, the brand that he was moving and I had many pieces, it was also of my interest to have my pieces that I also bought as an investor, not only as a collector but as an investor, then whatever we did good for the Max brand, it would have been good for me and good for the gallery. So any help that I could

give, it was also helping myself and my goods.
Q. So since you had invested money into Peter Max artwork, you figured you would increase your investment by going into the blogging about Peter Max and generating interest in the public into Peter Max because that could then raise the price of Peter Max artwork, which then would make your investment even better? Is that basically what you are saying, sir?
MR. LORENZEN: Object to the form.
THE WITNESS: There were some things that were for that intention and there were many other things that were as a historic collection. I still collect him because I feel eventually he's going to be very popular some day.
BY MR. WANDNER:
Q. After he dies, perhaps?
A. Perhaps after he dies, or when my successors, they will have some -- I was wishing that they had a good collection including the canvases and everything and I wanted it to be a nice collection of everything, canvases, collectibles, franchise goods and everything else.
Q. So you are fancying yourself a Peter Max

historian?

MR. LORENZEN: Object to the form.

THE WITNESS: I don't consider myself like that, but I wish I was.

BY MR. WANDNER:

Q. You used the word history.

A. I wish I was. I wish I could help.

Q. And your involvement with the Maxspace was in furtherance of that, right? That historian role, right?

MR. LORENZEN: Object to the form.

THE WITNESS: It could have been a little bit.

BY MR. WANDNER:

Q. As well as your article with those beautiful pictures helps you establish the history of Pete Max, at least your little piece of it, right?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Yes, sir, probably.

BY MR. WANDNER:

Q. Now, Info@maxspace.com, who owned that website?

A. Originally, I did a favor to Les, to

just get everything set it up so that it would be running perfectly and then hand it to him.

Q. So who originally owned it?

MR. LORENZEN: Object to the form.

THE WITNESS: Owned what?

BY MR. WANDNER:

Q. The website.

A. There's no ownership of a website. It is a domain. You mean the domain? I registered the domain.

Q. Under his name?

A. No, under my name.

Q. And then you transferred it to him?

A. I was supposed to transfer to him. He didn't want to follow through, so I don't know what happened to it.

Q. You never transferred it to his name?

A. No. He didn't follow through. He didn't continue using the website, so it just died by itself.

Q. You created it and you did use it for a period of time?

A. Yes, sir.

Q. By the way, (305)213-6378, that's your number?

A. That's my number, yes.

Q. Do you know if these cards ever went out into the public realm?

A. I think they were distributed, a few of them in the gallery.

Q. Just so I understand properly, this card which has the maxspace with this wonderful lounging Peter Max, sort of like the naked carpet guy that is all over Miami, sort of like that without the nakedness, of course, www.themaxspace.com, image courtesy of Ed Gugliotta, that's you?

A. Yes, sir.

Q. And on the back, www.twitter.com/maxspace website, info at the maxspace.com, of course these were things Mr. Roberts was using as part of his business and your phone number at the bottom, right, sir?

A. Yes. As a matter of fact, I was telling you before, we developed not only a client/provider relationship but we also started creating a friendship relationship. And I also tried to help him.

Q. This is your friend, the man you sued is your friend?

MR. LORENZEN: Objection to form; was.

THE WITNESS: Unfortunately, was, yes. I wish it didn't end that way.

BY MR. WANDNER:

Q. Life goes on?

A. Life goes on.

Q. Okay. Is it not true that during this friendship you had many e-mail contacts and discussions about other kinds of Peter Max work that you could do together?

A. Yes. We did have a couple of projects.

Q. And what were those projects, sir?

A. One of them was a project of doing some miniature guitars.

Q. Miniature guitars?

A. Yeah, that we were supposed to -- not supposed, we did, present to Pete Max studio, see if they were interested in the project and maybe giving the gallery the chance to distribute those little guitars.

Q. So before I sort of dive into this little area here, do you know whether the original artist authorizes other people to make pieces of art with their name on it?

A. Yeah. He's been franchising since '72.

Q. So in other words, since 1972 Mr. Max

has given other people the ability to create their own artistry and put his name on it?

A. With his authorization, yes.

Q. And that includes original canvases?

A. Supposedly not because an original canvas is handmade.

Q. But do you have information that suggests otherwise?

A. Otherwise, what?

Q. Do you have information that suggests that some artists including Peter Max authorize other people to create original paintings?

A. No.

Q. You don't have information to suggest that?

A. When you go that way you need to have proof. You can have anything in your mind but...

Q. Do you have anything in your mind? Do you believe that's what happens?

A. Not now because I've seen him in all the galleries in the world.

Q. Well, let me ask you a question. If I have four people making these originals and I'm the artist, I'm Peter and I have my four crew and I'm overseeing it and throwing a little flare here and

there and when it is over I put my name on it, is that an original?

A. I don't know.

MR. LORENZEN: Object to the form.

Q. You don't know?

A. I need to talk to the artist, see what he feels about. I cannot judge.

Q. So perhaps reasonable people could disagree as to whether that would be an original piece of Peter Max art?

A. If you say so. I don't know.

Q. Mr. Ferrari doesn't sit there and watch every rivet going into a Ferrari, does he?

A. No. He's dead.

Q. Ferrari, Jr.

MR. LORENZEN: Object to the form.

THE WITNESS: I don't know.

BY MR. WANDNER:

Q. So when you guys came up with this concept of making guitars, is this supposed to be a Peter Max style, this guitar here? Is this one of those that you created?

A. Yeah. That was maybe something that he could have done.

Q. But you did it?

A. I know, but he could have done -- the thing is we were going to present -- he said he was going to present a project to the studio. And if the studio accepted then we would have signed an agreement and then Les and the gallery would have been, like, the main distributor. That was the ultimate goal.
Q. And you were partnering with him in that endeavor?
A. Well, we didn't do it.
Q. What is that?
A. This was a project.
Q. Were you involved in that project?
A. Most probably I was involved.
Q. Did you create that image?
A. I don't recall doing this image.
Q. You are the one that mentioned guitars.
A. Yeah, but this is not exactly what I did.
Q. You did something like it, right?
MR. LORENZEN: Objection to form.
Q. You didn't have the authorization of Peter Max when you did that, right?
A. When you present a project, you don't do it until it is accepted. So the deal was

Mr. Roberts was going to go with the guitars to New York because he claimed that he had very good contacts over there, which I trusted him blindly and I said, Go ahead, go.

Q. But you created the images, he had the contacts, right?

A. Yeah, I created the concept. And the concept was to be presented to Peter Max. And in no moment it was supposed to be done unless it was accepted by the studio.

Q. Well, the first one would have been done because you had to have something?

A. You needed to do a project.

Q. So you have to create something that looks like Peter Max in order to go to Peter Max to get his authority to keep doing it?

A. I guess so.

Q. Did you ever follow up with Peter Max to determine --

A. Yes, I did. As a matter of fact, since Les did not do it eventually I went to the gallery in November, 2011 and I gave Gene Lunds the guitars. And I told him, Listen, look at this and this is a project that we have and we would like you to...

Q. And what did they say to you?
A. They said, We'll get back to you and they kept the guitars.
Q. Did they ever get back to you?
A. They never got back to me.
Q. Did they make the guitars?
A. I don't think so. I've never seen them.
Q. Did Peter Max ever make an image like that --
A. I don't think so. I haven't seen it.
Q. What about this one, is that you?
A. Yes.
Q. You sitting there with some sort of weirdness?
A. Yes.
Q. Did you create that weird picture?
A. No.
Q. What picture is that?
A. That's a picture from a lady called Moore.
Q. Who is she?
A. I don't know. She's an artist.
Q. Is that supposed to be Peter Max-like?
A. I don't know. I guess it is similar. It has some components of Peter Max.

Q. Did you own this piece of art?
A. I bought one of them. That one is mine, as a matter of fact.
Q. Who did you buy that from?
A. From Moore.
Q. And where did she get that idea from? Do you know?
A. No idea. I have many, many Peter Max things, collectibles, watches --
MR. LORENZEN: There's no question pending. Don't volunteer information.
Q. What about this one? What is that?
A. That's a picture I took of Les.
Q. What did you do with it?
A. I enhanced it a little bit.
Q. And then what did you do?
A. Sent it to him probably.
Q. What's the thing in the background?
A. That's a canvas, I guess. It is one of his canvases.
Q. Let me ask you a question. A few moments ago you mentioned that this project of yours with the guitars, the concept that you came up with was to create the project, the one, like the prototype, right? And then get it up to Max,

see if they will authorize it and if they authorize it you can turn it into a whole thing and sell it and make some shekels on it, right?

A. That was the basic idea.

Q. So it never got passed the prototype phase, right?

A. Never.

Q. So none of the things that you created did you ever authorize Les to put out into the open marketplace, right?

A. No.

Q. Not a one?

A. No, because we agreed that we were supposed to do it with Max' authorization. Maybe he had the prototypes at the store for a few days, I don't know. I don't remember.

Q. Well, do you remember sending Les here an e-mail back in May 29, 2010, 6:55:19 where you asked him for an update on the Peter Pen? What is the Peter Pen?

A. That was another project, but that one we didn't even follow through.

Q. Is that the Peter Pen?

A. Yeah. We didn't even do the prototypes.

Q. Max miniature guitars, that's the guitar

project you were talking about?
A. Yeah.
Q. Pictures and certificate from my Liberty Head?
A. That's what I needed.
Q. You needed pictures and a certificate for the Liberty Head you purchased?
A. Yeah.
Q. Trip to New York, 2nd week of June as proposed?
A. Because he wanted to go and he said we should go together.
Q. And that's to do what?
A. Maybe -- I never went to the gallery so maybe I was joining him if he went to New York to meet Peter again and maybe show him the guitars.
Q. Now, this is the real interesting part of this e-mail. Do you remember writing this little nugget? "I also was wondering if you would care to show two of my handpainted guitars for sale in one of your events? We can put a higher price in in order for you to receive 25 percent of the proceeds. Enclosed images again."
A. Yes. I have those guitars.
Q. You made those?

A. No, an artist made them for me. I am a collector of guitars.
Q. Is this not one of those, those prototypes you were discussing?
A. No. That's an actual guitar. That's my guitar. I have it, I own it. Well, I had three or four of them. As a matter of fact, one of them he did sell.
Q. And you are talking about the guitars or a photograph of the guitars?
A. The guitars, the actual guitars.
Q. You are asking him to put a guitar into a gallery?
A. He did, and he sold one.
Q. For how much?
A. I don't remember.
Q. So you had a guitar that you painted?
A. No. I didn't paint it. I don't paint.
Q. It says two of my handpainted guitars.
A. Yes, I commissioned the artist to do it.
Q. In what kind of style was it?
A. Whatever I like.
Q. And do you remember what the style was?
A. What do you mean? Which one specifically?

Q. How about the one in this picture? Has a lot of funky colors on it. Is it a Peter Max style?

A. No. It is not a Peter Max style.

Q. Do you know what style it was?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: I don't know. I'm not savvy enough to know what style exactly it is.

BY MR. WANDNER:

Q. What did you commission your people to make?

A. It depends on what I like. They don't necessarily have to be any particular style.

Q. Did you ever suggest to refer to these -- were you going to make them into photos and sell them?

A. No. My guitars? Well, I could do with them whatever I wanted, but no.

Q. Did you ever suggest to do that?

A. I don't remember. I don't think so, but I could do it.

Q. Let me ask you this: What is the Max guitar?

A. That's it, the miniatures. Those are the miniatures.

Q. So you call this the Max guitar?

A. Well, yeah. Those are the Max guitars, yeah.

MR. LORENZEN: Object to the form of the last question.

Q. So you were in the phase -- would you agree in August of 2010 you were in the phase of production of three samples of Max guitars, yes?

A. I don't exactly know the exact date, but probably.

Q. Cosmic, Patriot and Artistic?

A. Probably.

Q. And how many of those were created? Do you know?

A. I don't exactly know but probably there was a set for Les, one set for Peter Max and one set for me.

Q. And of course, again, you made these before you had any kind of authorization from Max, right?

A. Well, it is a project. How can I show what I want to do if I don't have it? Besides, I don't think it is any -- unless you don't go

commercial, what I was doing wrong? And I could have never done it without the consent of the gallery owner.

Q. But you said that you only had the prototype, you never actually made any more of them, right?

A. Well, that's what I do. We had a -- I'm not exactly aware but I think we did three sets, one for the gallery, one for me and one for...

Q. As part of this preparation phase for going into this, did you actually buy some domain names with the name Max in it?

A. Yeah. Probably we bought the Max guitar.

Q. How about maxspace.com, we talked about that already?

A. Yeah, we talked about that already.

Q. Maxart on-line, right?

A. We secured a few names because we didn't know exactly what was the one that he desired to use.

Q. And of course, you didn't get any kind of authorization from Peter Max' headquarters to do any of that, right?

A. I am not very sure that I would need an

authorization from him. Max is a pretty -- as a matter of fact, my dog is called Max.

Q. And isn't it true, sir, at least in October of 2010 you had already made 260 units of some of these prototypes?

A. No. We never did that.

Q. Look at this e-mail dated October 26, 2010 and see what that has to say and maybe you can explain that.

A. It is confusing. That was an assumption of how many pieces would be needed to do an auction. So we said probably we will have 260 units in the collection. But we never did them.

Q. Sorry?

A. It was an assumption of quantities for an auction.

Q. It says here, I have already 260 units.

A. They were never made.

Q. So this is a lie?

A. It is not a lie. They were never made. It is an assumption.

Q. The man asked how many --

A. Maybe he asked, maybe I told him because he needed a number.

Q. So you lied to this guy, whoever he was?

A. I don't know if I lied or maybe I told him we were in the process of having them because we did do some numbers.

Q. But this is an e-mail from Eddie Gugliotta to Les Roberts, right?

A. Yes.

Q. And you are not talking to some random guy. You are talking to Les.

A. Read on the top. I think it has something to do with the auction.

Q. It says here, The man asked how many pieces do we think the site will have in the beginning, all included? (I have already 260 units in the collection). So it would be nice to estimate how many other pieces including the ones in the gallery we can promote on-line.

A. Exactly. We didn't have them. Maybe I made a mistake and said had or we will have. I never had them.

Q. You are suggesting in this e-mail you already have things out in the gallery you are promoting.

A. We knew perfectly that we didn't have them. We never got them done. So we never did these guitars because we didn't get the

authorization from the studio.
Q. How about the airplane?
A. What airplane?
Q. This one.
A. I bought it on-line.
Q. You bought a knockoff Peter Max Continental Airlines on-line?
A. Yeah. There are tons of them. It is not a knockoff. The original one, I think it is, like, 40, 50 million dollars.
Q. You sent Les an e-mail, "Peter says this is perhaps his best work and I managed to get a great wooden replica handmade."
A. Yes.
Q. It is a knockoff?
A. A knockoff of the huge, real 767.
Q. What did you send him that e-mail for?
A. Because he's a friend of mine. We shared tons of e-mails with stupid things, jokes, a lot of information. He was my friend.
Q. And a lot of information about fake stuff that you were creating?
A. What fake stuff? I didn't create that stuff. Go on-line you will find 100 --
Q. You created this guitar stuff, right?

A. No.

MR. LORENZEN: Answer the questions, please.

THE WITNESS: Questions?

BY MR. WANDNER:

Q. You created the Blushing Beauty acoustic guitar, did you not?

A. That was part of the project that was going to be presented to the studio. Without their acceptance nothing was to be done.

Q. How about this iPhone cover?

A. That's my personal use.

Q. So you created an iPhone --

A. For me, only for me.

Q. So you wouldn't need a demo of that since it is not going to be sold to anybody else?

A. No.

Q. So why would you on October 28, 2010 send an e-mail to Les saying, is that the one you are talking about? It is an iPhone cover with Love on it and, Oh, Lady Liberty again?

A. That's another project that we could have done because there were people that were easily contacted, you could contact them, and if he has -- if his contacts with the studio were as good

as he conveyed to me, we could have done many things and maybe they would have accepted.

Q. And the subject line of this e-mail was, "I ordered a demo."

A. For me. That was mine.

Q. Demos aren't for you. Demos are to demonstrate to other people.

MR. LORENZEN: Objection; argumentative.

THE WITNESS: I wanted to demonstrate to him.

BY MR. WANDNER:

Q. What do you care what he thinks about something you are getting for yourself?

A. Well, because he's my friend.

Q. Do you call him every time you buy a pair of underwear?

A. No, but when I purchase Pete Max things I always let him know.

Q. Especially when you are about ready to knock it off and sell it to other people, right?

MR. LORENZEN: Objection; assumes facts not in evidence.

THE WITNESS: Those are your words, overblown words I might add.

BY MR. WANDNER:

Q. Just for you, right, those iPhone skins?

A. Those are mine.

Q. It was just for you?

A. We never did it. It was a project that we could have done it.

Q. No, you testified this was just for you.

A. No, that's the only one we did, I did, and nobody else has it. I think so.

Q. And wasn't the concept that you were going to make for other people?

A. I did one for me and then I showed it to you.

Q. Only to show you what you had for yourself, right?

A. It is for myself. It is mine. It is for my personal use. But I knew who did them so that would have been a neat idea to do it if accepted by the studio.

Q. So in other words, this skin was not for you. This was a skin that you made to make a project to sell and make money?

A. It was for me, and once I had it, I said, Wow, that's a neat idea.

Q. "Hello, Les, I forgot to send you the

other product we had in mind, the skins for the devices." Who is we, by the way?

A. Him and me.

Q. "I already got all the info so you might as well discuss this item with Peter or Gene."

Who is Gene?

A. The manager of Peter Max.

Q. "We could order 50 and get wholesale price around $11, we could sell for $35."

A. That's it, if they accept it, Gene and Peter. So you are wasting your --

Q. Do you have any idea whether he called them?

A. I have no idea.

Q. And again, those guitars, you weren't going to do anything other than the prototype until you got authorization from Peter Max himself, right?

A. Yes, sir, and I went over there finally in November and gave it to them.

Q. Except on November 16, 2010, 9:49 p.m. you e-mailed Les and said, "I bought this transparency 35 mm, I believe with rights to use it but I don't really know. Still trying to make legal arrangements. By the way, guitars are

entering production as we speak."

MR. LORENZEN: Wait. Were you accurately quoting something?

MR. WANDNER: There it is in black and white and some yellow, the highlight.

THE WITNESS: Yeah, we were ready to do them but we never did them. Everything was set. Everything done, the prototypes ready. Les was supposed to take them to New York on July 6th and he didn't go. He had some other matters to attend, and we waited and waited. The guitars were ready. In November I finally went over there and delivered myself.

BY MR. WANDNER:

Q. After you had already entered production of the guitars?

A. They never entered production until we got the final okay. We had everything ready.

Q. This is in September, 2010, a little mea culpa you had to your friend Les. "Hey, Les, I got in love with this piece but I think I overpaid for it. It is uncommon since it is a fully designed and signed 1985 poster. At $400 it's a lot of money. I think I have to cool down for a while. This is a real vice."

What did you mean by all that?
A. Buying memorabilia from Peter Max. I'm buying things from Peter Max.
Q. And this is something you bought from him?
A. From who?
Q. From Peter Max.
A. No. This I bought on-line.
Q. Who is the signature from on the bottom?
A. Peter Max signs -- when he signs posters he usually puts the name of the owner of the poster.
Q. So that's Peter Max' signature there?
A. I assume so.
Q. You don't know for sure, though, do you?
A. It looks pretty much similar.
Q. And based upon that you spent $400 on that piece?
A. Yeah.
Q. How do you know it wasn't Joe Blow who wrote Peter Max on it?
A. As I told you in the beginning, I had a margin of risk that I was willing to take, and this is one of them.
Q. Let me ask you a question. Your margin

of risk that you were willing to take, what was that margin? Was there a dollar amount you were willing to risk?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Not a lot of money; I would never do that for a canvas, if that's your question.

BY MR. WANDNER:

Q. Do you know what a cost benefit analysis is?

A. Yeah.

Q. And I'm sure you know this in housing and buying, there's always a benefit and detriment to any deal, right?

A. Yes.

Q. So let me ask you a question. All these things you made as prototypes that you were e-mailing back and forth with and you were going to set up this line once it was authorized, of course, how much did you think you were going to make from all this?

MR. LORENZEN: Object to the form.

THE WITNESS: I have no idea.

BY MR. WANDNER:

Q. I assume you were anticipating making some money on it, right?

A. Probably.

Q. And the money you were going to make on it was based upon Mr. Roberts' contacts, right?

MR. LORENZEN: Object to the form.

You may answer.

THE WITNESS: Through his contacts, yes.

BY MR. WANDNER:

Q. That he had?

A. Yeah.

Q. So you were going to, in your mind, hope to make some money on his contacts, right?

MR. LORENZEN: Object to the form.

THE WITNESS: I guess so, yeah.

BY MR. WANDNER:

Q. So in your mind you did a cost benefit analysis that, Hey, I better accumulate a relationship with this man because, Hey, look what I can turn it into. I get some artwork and I can make some money on it, too, right? That works for your head.

A. It is peanuts compared to the prices of the canvases.

Q. I see. So you agree, sir, if you had not bought anything from Les you would never have gone into this potential money-making endeavor with him, right?

MR. LORENZEN: Object to the form.

THE WITNESS: For me it was not a money-making endeavor.

BY MR. WANDNER:

Q. But you discussed money in these e-mails, though, right?

A. This is part of my hobby. This is like a hobby. That's entertainment.

Q. It seems like you took a lot of time on it, right?

A. Yeah, because I like it. Now I don't like it anymore but I liked it very much.

Q. My point I'm trying to make is if you hadn't started buying things from Mr. Roberts, Peter Max related things, you would never have gotten into a position to be seeking to enter into this phase of making some money on it, whether it was a lot of money or little amount of money, right?

MR. LORENZEN: Object to the form.

THE WITNESS: I have would not even met

Peter Max the second time.

BY MR. WANDNER:

Q. Right. And you would have never met Les, right?

A. I would have never met Les.

Q. You wouldn't have called Les and said, Les, I'm not going to buy anything from you but I have this great idea to make these Lady Liberties and these guitars, that wasn't going to happen because you had no relationship with the guy, right?

MR. LORENZEN: Object to the form.

THE WITNESS: That I can't answer. I don't know because I cannot go back to the past and predict what would have happened.

BY MR. WANDNER:

Q. You agree, sir, that your purchases of Pete Max artwork from Les established a relationship between you and him, correct?

A. The purchase from the first piece from the road show, yeah, probably.

Q. And you even said it led to a friendship, right?

A. Yes, sir.

Q. And it led to lots of communication,

right?

A. Yes, sir.

Q. And it led to you creating these beautiful pieces of whatever they are, guitars and otherwise which you and Mr. Roberts and maxspace and your phone number all endeavored to create a business out of, right, sir?

MR. LORENZEN: Objection to form; mischaracterizes the evidence.

You may answer to the best of your ability.

THE WITNESS: The thing is, what does it -- is it related to the canvases? Why should I keep on answering?

MR. LORENZEN: You can keep on answering.

THE WITNESS: So, what? Say it again.

BY MR. WANDNER:

Q. I'm happy to. Your purchases of Peter Max artwork from Les led to a business relationship where you were buying and he was selling, right? Peter Max artwork, right?

A. Part of it, yes.

Q. It led to a friendship, right?

A. Yes.

Q. And it led you to establishing or proceeding with some form of a business relationship relating to the maxspace website, right?

MR. LORENZEN: Object to the form.

THE WITNESS: Yes.

BY MR. WANDNER:

Q. And ultimately led to your creations of some prototypes of some Peter Max design that you were seeking with Les' contacts to try to get authorized to make them and make some money on it, right?

MR. LORENZEN: Object to the form.

THE WITNESS: But it is not my core business. It is my hobby.

BY MR. WANDNER:

Q. But you would agree, sir, this end phase of creating this line that you were going to be using with Les' contacts, that never would have happened had you not made those initial purchases of Peter Max artwork from him that established your relationship?

A. Most probably.

Q. Thank you. How about this, A beauty. Hi, Les, quid pro quo, I overpaid for the poster

but got this beauty at the same price, 1973 Max. What is that design there?

A. That's a serigraph, a Peter Max serigraph.

Q. And do you know whether it is original or not?

A. I think it is.

Q. And your basis and belief is what?

A. Well, after seeing so many now I can -- oh, yeah, I know why. Because it has the seal from a very renowned gallery, so it is provenance proof.

Q. But that doesn't necessarily make it an original, does it?

A. Yes. It is very tough to do that.

Q. And the one you bought with Mr. Max in front of it, the one you bought with Lady Liberty with Max right in front of it from the magazine, did it have that provenance stamp like this one?

A. No. It has something better, the guy signing it behind.

Q. Did you ever inquire whether this is real or not?

MR. LORENZEN: Object to the form.

Q. From Max himself?

MR. LORENZEN: Objection.

THE WITNESS: I got some specs from the seller and I think that it was quite legit.

BY MR. WANDNER:

Q. Do you know whether the place you got this from is some place Les may have obtained some of those 10 or 11 canvases?

A. I have no idea.

Q. But again, you were assuming based on the place that you got it from that it was original and legit, right?

A. But never a canvas.

Q. Is that not a canvas?

A. No. That's a serigraph. I never would have bought canvases from another place unless it was an authorized gallery from Peter Max, or the studio directly.

Q. Who were the persons that you contacted to make those guitars and pens and all that? What were those persons' names?

MR. LORENZEN: Objection to form.

THE WITNESS: We never contacted anybody.

BY MR. WANDNER:

Q. How about the guitars?

A. There's one place that did a few guitars

for me and I purchased some guitars.
Q. What is the place's name?
A. It is called the Ax Heaven.
Q. Where are they?
A. I don't know. They are on-line.
Q. Ax Heaven?
A. Yeah.
Q. How about the pens?
A. Nobody; we never contacted anybody. It was an idea, concept.
Q. You never contacted anybody?
A. Maybe I sent some inquiries to some pen producers but we never did anything, for sure.
Q. You know, Mr. Gugliotta, every time I ask you a question you say one thing and then when you see me leafing through a paper something rings in your head.
A. That was a long time ago. I don't have a perfect memory. Some things I recall right away. Others, no.
Q. How about this e-mail you sent to Les, May 24, 2010, "Dear Les, I got one of the best pen manufacturers of the USA on board."
A. Oh, yeah. That was Acme, yes. That was what I sent them and I told him if they were

interested, yes.

Q. What was the company called?

A. I think it is Acme.

Q. Now, you said you had some conversations with the FBI, correct?

MR. LORENZEN: You may answer.

THE WITNESS: What do you mean?

BY MR. WANDNER:

Q. You met the FBI before regarding this case, right?

A. Yeah. They came to my house.

Q. Is that one time or multiple times?

A. They came to my house a couple of times. We met here at the office of Mr. Dirk once, too.

Q. When was the last time you met with the FBI?

A. Here at the office.

Q. When was that?

A. I don't recall. Can you find that out?

MR. LORENZEN: I'm not allowed to answer.

THE WITNESS: Okay. I don't know.

BY MR. WANDNER:

Q. Did they ever come to your house without coordinating ahead of time, like, with a

search warrant?
A. No.
Q. They never came with a search warrant?
A. No.
Q. With guns out, that kind of thing?
A. No.
Q. Never?
A. Are you kidding?
Q. No, I'm asking you.
A. No. They were very polite, very nice and called in advance.
Q. Now, you said in your Complaint you reference -- I'm going to try to get to the last edge here because we all have things to do.
You said Sylvia was involved in this work. You never really mentioned her at all during your entire deposition. Was she an employee over there?
A. I don't know.
Q. So she wasn't really involved in any of the discussions you had back and forth with him?
A. Not exactly.
Q. So really, you didn't rely on anything she had to say in regard to any of this?
A. Not personally.

Q. I appreciate your candor there.
A. Yes, sir.
Q. So based upon your last couple of questions you have no evidence that Sylvia conspired to sell any forged art, correct? You have no information in that regard, right?
MR. LORENZEN: Objection to form; instruct you not to answer to the extent of any information you obtained through counsel. If you know otherwise, you may answer.
BY MR. WANDNER:
Q. Based upon your last two answers you have no evidence that Sylvia conspired to sell any forged art, correct?
MR. LORENZEN: Same objection, same instruction.
THE WITNESS: She was present sometimes but I don't know exactly what was going on between them.
BY MR. WANDNER:
Q. In paragraph 10 of your Complaint you suggest that Peter Max has certain medical and cognitive issues, as well as other commitments such as meet-and-greet exhibitions for his time that prevent him from actually producing the art

marketed under his name.

Do you agree with that statement?

A. That was informed to me by Les, that he said that he knew from the studio that Peter Max was having a physical ailment that probably hindered his activities.

Q. And you knew that at the time you were making these purchases and what not, right?

A. I didn't know as a fact. I wasn't there. I'm not his doctor. I don't know what's going on.

Q. But Les told you that?

A. Yeah, Les told me that.

Q. So at the time you were making these purchases you were aware that Peter was perhaps not actually producing the art marketed under his name?

A. Perhaps; it was a speculation.

Q. Speculation you were aware of before you bought his artwork.

A. I was not aware.

Q. He told you that.

A. He told me he didn't know for sure, either. How did he find out, he's a doctor? I don't know. When there's voices, there's voices and you don't know what's for sure.

Q. True. And in fact, Mr. Max at the day of this meet-and-greet actually told you that Les and his company were approved brokers for the sale of genuine Peter Max art, right?
A. Yes.
Q. Peter told you that himself?
A. Not Peter maybe but the people with him.
Q. But you know the people were with him, not with Les, right?
A. Les was most of the time right there next to us. He's not ignorant of what was happening.
Q. But at that meet-and-greet Peter Max, the original guy, and his cadre told you that Les is selling genuine Peter Max artwork, right?
A. I don't know if he used those words but he was there.
Q. Let's look at paragraph 14 of your Complaint, okay? Peter Max personally met collector at Max In The Grove with Roberts to assure him that Max In The Grove is an official and approved outlet through the approved buyer Roberts for the sale of genuine Pete Max art.
A. If he's there and they are saying it is art, it has to be genuine.

Q. And you, of course, indicated this to your lawyer, which is why it ended up in your Complaint, right?

A. Absolutely. That's what we said. That was your first question at the beginning of the whole thing.

Q. And you knew that at the time you were purchasing this artwork from Mr. Roberts, right?

A. That's what I assumed.

Q. This is what you were told by Peter Max personally, that what he was selling was genuine. That's what your Complaint says.

A. I don't recall they said those exact words but his presence there made it pretty evident.

Q. Paragraph 16, Collector was informed by FBI after an investigation, inspection of the art he acquired from Roberts that most of the pieces he had purchased as original and genuine Peter Max artwork complete with certificates of authenticity were, in fact, forgeries. This suit arises from this purchase of forged art, correct? That's what this suit is all about, that paragraph right there?

A. I think so, yeah.

Q. Now, you have no personal evidence that

Les Roberts forged any of that, correct?
A. Well, I don't know what more evidence do I need than the American police institution comes to my house and tells me that those are forgeries.
Q. Did they tell you that he forged them?
A. Well, they didn't tell me that he forged them but they told me, Where did I buy them from?
Q. So you personally have no information that he forged them, right?
A. I didn't see him do it.
Q. Nor Sylvia, right?
A. No.
Q. And they didn't tell you that Sylvia and Les Roberts forged them, right? They didn't tell you that?
MR. LORENZEN: Object to the form.
THE WITNESS: No.
BY MR. WANDNER:
Q. All they told you was that the certificates of authenticity were forged, right?
A. And the canvases.
MR. LORENZEN: Object to form.
Q. And the canvases were forged, right?
A. Yeah.
Q. And you have no reason to believe or

evidence to contradict that Les and Sylvia were not aware that they were forged at the time they obtained them and sold them to you, right?

A. I don't care.

Q. You don't care?

A. No, because I'm just asking for retribution for what I bought from a certified Peter Max origin. So I'm not in the business of judging who did them, who didn't do them. I'm just in this lawsuit because I'm being hurt by this operation.

Q. So, in other words, you are not here to say that either one of these either forged this artwork or knew of the forgery? Your complaint is that they sold it, it wasn't real and therefore they owe me the money, right? Is that basically what you are here to say?

A. Well, I think this is a civil case, right?

Q. Right.

A. Well, if this was not a civil case but a legal case, then it was different.

Q. But this case here that we're talking about --

A. This is just a plain case of commercial

retribution.

Q. A breach of contract kind of thing?

A. That would be like a breach of contract and I'm just seeking for my retribution.

Q. And nothing more than that, right?

A. At this point, yes.

Q. Paragraph 30, It is unknown how the forgeries were created. Discovery is required to determine who participated in the forgery process.

That remains the same today, right? Based on your answer, you've learned nothing more about who created the forgeries, right, as we sit here today?

A. As we speak, no.

MR. WANDNER: Let's take a break for two minutes.

(A brief recess was taken, after which the following proceedings were had:)

BY MR. WANDNER:

Q. Is this your signature or your artwork, the maxstore?

A. I made this, yeah.

Q. The same as the Max In The Grove?

A. No. That was done similar to the other Max one.

Q. I think I'm basically done.
Based upon the last couple of questions that we asked and that you answered, candidly I believe, sounds like to me, you would agree based upon your testimony of the last couple of questions and answers about the knowledge issue, you know what I'm talking about, right? If I were to make the following statement to you, Les Roberts and Sylvia Castro Roberts sale to Ed Gugliotta of forged art was knowing and deliberate, you can't say that that's true, right?
MR. LORENZEN: Object to the form.
You can answer.
THE WITNESS: I can say -- let me try to see. I don't know who did it. I cannot say they did it. The only thing I know is that they sold it to me.
BY MR. WANDNER:
Q. And you can't say they did it and you can't say they knew it was forged, right?
A. I can't.
Q. The Robertses provided false certificates of authenticity they created and gave to you. Now, I understand you believe they were false but you cannot say they created it based on

what you just testified; is that true?

A. True.

Q. And finally, the Robertses forged certificates of authenticity from third parties. Based upon your last couple of answers you can't say that's true, correct?

MR. LORENZEN: Object to the form.

THE WITNESS: That's based fundamentally from the FBI report.

BY MR. WANDNER:

Q. Again, you have no personal knowledge that any of that is true?

A. I have no personal knowledge.

MR. WANDNER: That's all I have.

MR. LORENZEN: Okay, I have a few questions.

CROSS EXAMINATION

BY MR. LORENZEN:

Q. Why do you believe that the Robertses forged the certificates?

A. Why do I believe?

Q. Yes.

A. Because when the FBI came to my house they gave me a whole briefing, and they explained exactly what each one of the things made the

difference between a certificate and another one.

Q. Is there any correspondence between the type of paper used by Les Roberts?

A. Yes, as a matter of fact.

Q. And the paper used for the certificates?

A. Yeah.

Q. Was identical to the forged certificates?

A. One of the forged certificates has identical paper to one of the invoices from the gallery.

Q. I'll direct your attention to this e-mail you were asked about earlier, the one that referred to the 260 units of the collection. Do you remember seeing that e-mail?

A. Oh, I know what it means, that I have already 260 units in my collection.

Q. Units of what?

A. Collectibles in my collection; now I understand. I already -- now I have 340. At that time I had 260.

Q. That wasn't 260 guitars?

A. No, 260 pieces in my collection.

Q. And what do the 260 pieces consist of?

A. Collectibles, watches, books,

memorabilia things, canvases, everything. My whole collection of Peter Max at that time was 260 pieces.

Q. There was a discussion about guitars that got confusing in my opinion so I wanted to just clarify.

Do you have full-sized guitars painted?

A. But not by Peter Max.

Q. So you have full-sized guitars that are works of art?

A. Yes, sir.

Q. And so that is what you put into the show?

A. Yes. One of them.

Q. And that was sold?

A. Yes.

Q. Nothing to do with Peter Max?

A. No.

Q. The mini guitars, none of those were ever sold?

A. No.

Q. They were never put into production?

A. No.

Q. They were done solely for the sake of trying to get permission to be able to put them

into production by Peter Max?
A. Yes.
Q. And did you speak with people at the Max gallery directly about this?
A. The Max gallery or Max studio?
Q. The Max studio.
A. Yes. I showed them to Gene Lunds and Mrs. Liz Derringer.
Q. The pen that you were asked about, is that something that you would have required Max to approve?
A. Not necessarily because we never even showed it to him. It never passed an idea stage.
Q. But if you were going to produce it, would it require Max' approval?
A. Yeah, absolutely.
Q. You were asked about your early two canvases. First canvass that you purchased was a Liberty head, correct?
A. Yes, sir.
Q. What was the second canvass?
A. I think it was The Cosmic Runner.
Q. And do you know if The Cosmic Runner that you received was identical to the -- is the same piece there at the time of the meet-and-greet?

A. I don't know, but according to the FBI, no.

Q. Are there differences between the picture of The Cosmic Runner at the meet-and-greet and The Cosmic Runner that you have?

A. According to the FBI there are some inconsistencies.

Q. So, those are different pictures?

A. I would say. That's why I assumed. I never...

Q. Are you a Max collector?

A. I consider myself a Max collector.

Q. Did you see numerous documents today that you have not seen from the discovery that we propounded? Some of those pictures you saw today we didn't get them?

A. I'm not sure about only one of them.

MR. WANDNER: Which one is that, sir?

THE WITNESS: The one of the guitar, the one that you showed me that had a little guitar inside. I'm not very sure about that.

MR. WANDNER: That's the only one you haven't seen in discovery? We'll be more than happy to provide a copy to you.

THE WITNESS: That's the only one.

BY MR. LORENZEN:

Q. Were you prevented from finding out who committed these forgeries by the fact that Sylvia Castro and Les Roberts took the Fifth Amendment today and refused to answer questions?

A. Absolutely. If they don't answer the questions how can we go to the bottom of the information?

Q. Did they produce any documents that would establish conclusively where your canvas came from?

A. No.

Q. The fact that there was no documents establishing where your canvases came from, does that evidence the fact that they must have gotten them through some illegal source?

A. Well, I don't know what's the intention behind them of getting the Fifth Amendment, but if they had something that they could make public why didn't they come up with it?

Q. If they had some legitimate source or explanation?

A. Exactly. They could say we bought it from this guy or the other guy. Why didn't they provide the information we required? That would

have ended the whole story.
Q. Did Sylvia Roberts or Sylvia Castro work with Les?
A. I don't know their private business relationship. I know she's a partner in the few of the companies and she has been present in a few of my visits to the gallery but I cannot -- I don't know what's her capacity.
Q. But you heard while Sylvia Roberts took the Fifth Amendment as to all the questions asked of her?
A. Yes, I heard that, and I was surprised.
Q. When you told Les that the canvases were forged, what did he say?
A. Well, he acted surprised and he said that he was going to retribute any loss that I may have.
Q. So he said he would pay you for it?
A. Yes, and he tried to.
Q. That was through American Express?
A. Through American Express but it didn't go through.
Q. And at that time your damages were 63,000?
A. 63,000 and change.

MR. LORENZEN: No further questions.
MR. WANDNER: I have one followup.
REDIRECT EXAMINATION
BY MR. WANDNER:
Q. This Bank of America thing, explain to me what happened.
A. Bank of America?
Q. I'm sorry, American Express. He said he would pay you back?
A. Yes.
Q. He didn't admit knowledge, anything like that, right?
MR. LORENZEN: Object to the form.
Q. He didn't admit he knew this was forged or anything like that, right?
MR. LORENZEN: Object to the form.
Q. He didn't say, You are right, it is all forged, it is all bullshit but I'll give you your money back. That didn't happen, right?
A. He said in the tone of, "Oh, oh."
Q. A businessman acknowledging that you weren't happy --
A. That can't be possible, that's not possible. I mean, he was surprised.
Q. And you said that he tried to pay you

back?
A. He did. He tried to, yes.
Q. How did he try?
A. He tried to go through his credit card and pay me with a credit card and probably he was going to -- planning to maybe, I don't know, pay installments. I don't know.
Q. Why didn't it work?
A. American Express never accepted.
Q. Wouldn't allow him to do it?
A. They would not allow him to do it. That's not the exact word. I don't know that. I don't know what technical issues there were between him and the card issuer.
Q. But you accept that his intent was to pay you back?
A. The first time, yes. The second time, yes. The third time I wasn't sure. There were, like, three times trying to do it and it never went through.
MR. WANDNER: Got it. No further questions.
MR. LORENZEN: We read.
(The deposition was concluded at 4:15 p.m.)

(Reading and signing not waived.)

______________________________

EDMUNDO GUGLIOTTA

________________________

Notary Public

My Commission Expires:

CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, the undersigned authority, certify that EDMUNDO GUGLIOTTA personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 22nd day of June, 2014.

MARIANNE TERTAN
Notary Public - State of Florida
My Commission No. EE828603
Expires September 14, 2016

REPORTER'S DEPOSITION CERTIFICATE

I, MARIANNE TERTAN, Shorthand Reporter, certify that I was authorized to and did stenographically report the deposition of EDMUNDO GUGLIOTTA; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of June, 2014.

Marianne Tertan

MARIANNE TERTAN