**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**In Re:**

**Leslie Howard Roberts, Jr.**
**Silvia Castro Roberts,**
**Debtors.**
**_________________________/**

**Case No. 11-39825 LMI**
**Chapter 7**

**Leslie Howard Roberts, Jr.**
**Silvia Castro Roberts,**
**Plaintiffs,**

**vs.**

**Edmundo Gugliotta,**
**Defendant.**
**_________________________/**

**Adv. Case No. 13-01140 LMI**

**PLAINTIFFS' MOTION FOR SUMMARY FINAL JUDGMENT**

**COME NOW THE PLAINTIFFS, LESLIE HOWARD ROBERTS, JR. AND SILVIA CASTRO ROBERTS,** by and through the undersigned attorney and pursuant to Fed R. Civ. P. 56, and hereby move this Court for a Summary Final Judgment and in support thereof state the following:

**Opening Statement**

Summary Judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). The Court is to construe all facts and draw all reasonable inferences in favor of the *nonmoving* party. Abel v. S. Shuttle Servs., Inc., 620 F.3d 1272, 1273 n.1 (11th Cir. 2010). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986),

and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

## Statement of Material Facts

1. The Plaintiffs/Counter-Defendants (hereafter referred to as the Debtors), filed a Complaint to Determine the Dischargeability of any Claimed Debt of Defendant/Count-Plaintiff Edmundo Gugliotta (hereafter referred to as the Creditor) [ECF 1].

2. The Creditor responded by filing an Answer [ECF 6] and a Counterclaim to Determine Dischargeability [ECF 7]. The Creditor alleged in his counterclaim that any purported debt to him is exempt from discharge pursuant to 11 U.S.C. §523(a)(2)(A), (4), and (13).

3. The relevant allegations of the Creditor's counterclaim are that:

(a) The Debtors are art dealers and that the Creditor is an art collector;

(b) The Debtors sold the Creditor forged art and represented the art was genuine;

(c) The Debtors forged certificates of authenticity from third parties and provided them to the Creditor;

(d) The Debtors' sale was a knowing and deliberate act; and

(e) The Creditor was damaged by his purchase of the art.

4. The Debtors filed an Answer [ECF 8] in which they admitted that they deal in art but denied the other allegations set forth above.

5. The Creditor also alleged in his counterclaim that:

(a) Art dealers have fiduciary duties in connection with the sale of their art;

(b) The Debtors committed larceny by fraud;

(c) The debt to the Creditor arises from money obtained by false pretenses, false representations, and actual fraud;

(d) The Debtors were acting in a fiduciary capacity when they committed fraud and defalcations; and

(e) The debt will be converted into an order of restitution and therefore will be exempt from discharge under 523(a)(13) of the Bankruptcy Code.

6. The Debtors' denied these allegations in their Answer.

7. On May 2, 2013,the Creditor filed a Motion for Summary Judgment as to the Issue of Dischargeability [ECF 13].[1]

8. The Creditor attached a Sworn Affidavit in Support of his Motion for Summary Judgment. In his Affidavit the Creditor stated as fact that the Debtors did indeed make false representations upon which he relied.

9. However, when the Creditor was deposed on April 16, 2014 [ECF 32], the Creditor conceded many facts that belie the allegations and conclusions contained in both the counterclaim and the Sworn Affidavit.

**11 U.S.C. §523(a)(2)(A)**

10. 11 U.S.C. §523(a)(2)(A) excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11. In order for this Court to sustain the Creditor's objection to the bankruptcy discharge based upon §523(a)(2)(A), the Court must find that the Debtors made a representation

---

[1] The Motion was denied on July 1, 2013 [ECF 25].

that they knew at the time was false and that the purportedly false representation was made with the intention of deceiving the Creditor who relied upon the representation and who sustained a loss or damages as the proximate result of the purportedly intentional false representation. Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); In re Graham, 122 B.R. 447, 450 (Bankr. M. D. Fla.1990); In re Young, 90 B. R. 521, 522 (Bankr.M. D. Fla.1988); In re Hunter, 780 F.2d 1577, 1579 (11th Cir.1986).

12. When the Creditor testified at his deposition, he was asked whether Debtor Silvia Roberts was really involved in any of the discussions the Creditor had back and forth with Debtor Leslie Roberts. The Creditor replied "Not exactly." Deposition Transcript Page 112, Lines 20 - 22.

13. When the Creditor was asked whether he relied upon anything Silvia Roberts had to say in regard to "any of this," the Creditor replied "Not personally." Deposition Transcript Page 112, Lines 23 - 25.

14. When the Creditor was asked whether he had any evidence that Sylvia Roberts conspired to sell any forged art, the Creditor replied, "She was present sometimes but I don't know exactly what was going on between them [the Debtors]." Deposition Transcript Page 113, Lines 3 - 19.

15. When the Creditor was asked whether or not he agreed with a statement he made in the complaint filed in state court that "upon information and belief, Peter Max has certain medical and cognitive issues as well as other commitments such as meet-and-greet exhibitions for his time that prevent him from actually producing the art market under his name," the Creditor, freely admitted that this information was conveyed to him by Leslie Roberts "that he [Leslie Roberts] said that he knew from the studio that Peter Max was having a physical ailment that probably hindered his activities." Deposition Transcript Page 113, Line 21 - Page 114, Line 6.

16. The Creditor further acknowledged that he knew this at the time he was making the purchases. Deposition Transcript Page 114, Lines 7 - 25.

17. When the Creditor was asked whether the Federal Bureau of Investigation (the FBI) told the Creditor that the Debtors forged the art and/or the certificates of authenticity, he replied, "No." Deposition Transcript Page 116, Line 16 - Page 117, Line 24.

18. When the Creditor was asked whether he had any reason to believe or evidence to contradict that the Debtors were not aware that the art and the certificates were forged at the time the Debtors obtained them and sold them to the Creditor, he replied "I don't care." Deposition Transcript Page 117, Line 25 - Page 118, Line 4.

19. The Creditor elaborated by saying " I'm just asking for retribution for what I bought from a certified Peter Max origin. So I'm not in the business of judging who did them, who didn't do them. I'm just in this lawsuit because I'm being hurt by this operation." Deposition Transcript Page 118, Lines 6 - 11. The Creditor went on to say "this is just a plain case of commercial retribution." Deposition Transcript Page 118, Line 25 - Page 119, Line 1.

20. When the Creditor was asked if this was anything more than a breach of contract he said "That would be like a breach of contract and I'm just seeking for my retribution and nothing more than that at this point." Deposition Transcript Page 119, Lines 2 - 6.

21. The Creditor also acknowledged that he has no knowledge as to how the forgeries were created or by whom. Deposition Transcript Page 119, Lines 7 - 14.

22. The Creditor concluded his deposition direct examination by stating "I don't know who did it. I cannot say they [the Debtors] did it. The only thing I know is that they sold it to me." Deposition Transcript Page 120, Lines 14 - 17.

23. Finally, the Creditor acknowledged that he can't say whether the Debtors knew the art and/or the certificates were forged. Deposition Transcript Page 120, Line 19 - Page 121, Line 13.

24. Exceptions to discharge are construed narrowly. 11 U.S.C. § 727(a), (b); Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir.1994).

25. The Creditor affirmatively acknowledged that he has no basis to conclude that the Debtors committed any act or acts of intentional fraud and that he is merely seeking "retribution for what [he] bought from a certified Peter Max origin."

26. However, 11 U.S.C. § 523(a)(2)(A) does not except from discharge debts that merely arise from a breach of contract dispute.

27. The Creditor acknowledged while under oath that, contrary to what he alleged in his counterclaim, the Debtors did not make a false representation. Absent a false representation, the Debtors committed no fraud which can render the Creditor's claim nondischargeable under §523(a)(2)(A). Hoffend v. Villa, 261 F.3d 1148 (11th Cir., 2001).

**11 U.S.C. §523(a)(4)**

28. 11 U.S.C. §523(a)(4) excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

29. The Supreme Court has consistently held that the term "fiduciary" is not to be construed expansively but instead is intended to refer to technical trusts. Quaif v. Johnson, 4 F.3d 950, 953 (11th Cir.1993) (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

30. Moreover, the trust relationship must have existed prior to the act that created the debt in order to be exempt from discharge. Id. at 953 (citing Matter of Angelle, 610 F.2d 1335 (5th Cir.1980)).

31. The Creditor alleges in his counterclaim that "art dealers have fiduciary duties in connection with their sale of art" and that "in their bankruptcy paperwork, the Debtors represented that all the art in their gallery is on consignment and that there are signs posted that so advises (sic) the public ... any sale of this art would be a sale in their fiduciary capacity; and the fact that the fraud and defalcation occurred while in their fiduciary capacity would be another basis for denying discharge." [ECF 7, Page 7, Paragraphs 36, 37].

32. The counterclaim fails to allege a factual basis upon which the Court should construe the existence of a fiduciary relationship between the Creditor and the Debtors. At best, any fiduciary relationship, if there ever was such a relationship, would only be between the Debtors and the artists who displayed their art in Leslie Roberts' gallery.

33. Moreover, even if a fiduciary relationship had existed between the Creditor and the Debtors, the counterclaim does not allege that there was an actual defalcation while acting in that fiduciary capacity.

34. Defalcation is defined as the failure to produce funds entrusted to a fiduciary. Quaif at 955.

35. The counterclaim does not allege that the Creditor deposited funds, goods, or any other assets with the Debtors to be held in trust, either actual or constructive.

36. As such, a request by the Creditor to have his alleged claim declared excepted from discharge under 11 U.S.C. §523(a)(4) must be denied as a matter of law.

**11 U.S.C. §523(a)(13)**

37. 11 U.S.C. §523(a)(13) excepts from discharge any debt for any payment of an order of restitution issued under Title 18 of the United States Code.

38. The Creditor alleges in his counterclaim that "it is contemplated that the debt will be converted into an order of restitution under title 18 of the United States Code and therefore will also be exempt from discharge under 523(a)(13) of the Bankruptcy Code." [ECF 7, Page 8, Paragraph 44].

39. Fed R. Civ. P. 11(b) states that when an attorney files a pleading, he is certifying that the claims and other legal contentions contained therein are warranted by existing law and either have evidentiary support or will be likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

40. The Creditor did not attach any order of restitution under Title 18 nor does he allege in the counterclaim any basis for this Court to conclude that the alleged debt is based upon an order of restitution.

41. In the absence of an order of restitution, the Creditor's demand that his alleged claim be excepted from discharge under 11 U.S.C. §523(a)(13) must be denied as a matter of law.

**Conclusion**

The Creditor seeks to have his alleged claim declared nondischargeable based upon three sections of the United States Bankruptcy Code. However, with respect to two of those sections (§523(a)(4), and (13)), the Creditor has not alleged facts that support the legal conclusions he has reached. When the facts fail to establish a basis for relief, relief should not be granted and final summary judgment is the proper remedy to dispose of the proceeding.

With respect to 11 U.S.C. §523(a)(2)(A), the Creditor acknowledges with his own sworn testimony that the alleged claim does not rise to the level of one that can be declared nondischargeable. When testimony and other evidence demonstrates that there is a complete absence of material facts in dispute, final summary judgment is the appropriate remedy.

**WHEREFORE, PLAINTIFFS LESLIE HOWARD ROBERTS, JR. AND SILVIA CASTRO ROBERTS** respectfully request that this Court grant this Motion for Summary Judgment and enter a Final Judgment Discharging any Claimed Debt of Edmundo Gugliotta.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 30, 2014 a copy of the Foregoing Motion for Summary Final Judgment was delivered to Dirk Lorenzen, Esq. by email to eservice.lorenzenlaw@gmail.com.

Submitted by: /s/ Mark S. Steinberg
Signature

Mark S. Steinberg, Esq.
Florida Bar No. 883913
Attorney for Debtors
9400 South Dadeland Boulevard
Penthouse Five
Miami, Florida 33156
Telephone: (305) 671-0015
Primary email: mss@steinberglawoffices.com
Secondary email: mss25@juno.com

# EXHIBIT "A"

search warrant?

A. No.

Q. They never came with a search warrant?

A. No.

Q. With guns out, that kind of thing?

A. No.

Q. Never?

A. Are you kidding?

Q. No, I'm asking you.

A. No. They were very polite, very nice and called in advance.

Q. Now, you said in your Complaint you reference -- I'm going to try to get to the last edge here because we all have things to do.

You said Sylvia was involved in this work. You never really mentioned her at all during your entire deposition. Was she an employee over there?

A. I don't know.

Q. So she wasn't really involved in any of the discussions you had back and forth with him?

A. Not exactly.

Q. So really, you didn't rely on anything she had to say in regard to any of this?

A. Not personally.

Q. I appreciate your candor there.
A. Yes, sir.
Q. So based upon your last couple of questions you have no evidence that Sylvia conspired to sell any forged art, correct? You have no information in that regard, right?
MR. LORENZEN: Objection to form; instruct you not to answer to the extent of any information you obtained through counsel. If you know otherwise, you may answer.
BY MR. WANDNER:
Q. Based upon your last two answers you have no evidence that Sylvia conspired to sell any forged art, correct?
MR. LORENZEN: Same objection, same instruction.
THE WITNESS: She was present sometimes but I don't know exactly what was going on between them.
BY MR. WANDNER:
Q. In paragraph 10 of your Complaint you suggest that Peter Max has certain medical and cognitive issues, as well as other commitments such as meet-and-greet exhibitions for his time that prevent him from actually producing the art

marketed under his name.

Do you agree with that statement?

A. That was informed to me by Les, that he said that he knew from the studio that Peter Max was having a physical ailment that probably hindered his activities.

Q. And you knew that at the time you were making these purchases and what not, right?

A. I didn't know as a fact. I wasn't there. I'm not his doctor. I don't know what's going on.

Q. But Les told you that?

A. Yeah, Les told me that.

Q. So at the time you were making these purchases you were aware that Peter was perhaps not actually producing the art marketed under his name?

A. Perhaps; it was a speculation.

Q. Speculation you were aware of before you bought his artwork.

A. I was not aware.

Q. He told you that.

A. He told me he didn't know for sure, either. How did he find out, he's a doctor? I don't know. When there's voices, there's voices and you don't know what's for sure.

Q. True. And in fact, Mr. Max at the day of this meet-and-greet actually told you that Les and his company were approved brokers for the sale of genuine Peter Max art, right?

A. Yes.

Q. Peter told you that himself?

A. Not Peter maybe but the people with him.

Q. But you know the people were with him, not with Les, right?

A. Les was most of the time right there next to us. He's not ignorant of what was happening.

Q. But at that meet-and-greet Peter Max, the original guy, and his cadre told you that Les is selling genuine Peter Max artwork, right?

A. I don't know if he used those words but he was there.

Q. Let's look at paragraph 14 of your Complaint, okay? Peter Max personally met collector at Max In The Grove with Roberts to assure him that Max In The Grove is an official and approved outlet through the approved buyer Roberts for the sale of genuine Pete Max art.

A. If he's there and they are saying it is art, it has to be genuine.

Q. And you, of course, indicated this to your lawyer, which is why it ended up in your Complaint, right?

A. Absolutely. That's what we said. That was your first question at the beginning of the whole thing.

Q. And you knew that at the time you were purchasing this artwork from Mr. Roberts, right?

A. That's what I assumed.

Q. This is what you were told by Peter Max personally, that what he was selling was genuine. That's what your Complaint says.

A. I don't recall they said those exact words but his presence there made it pretty evident.

Q. Paragraph 16, Collector was informed by FBI after an investigation, inspection of the art he acquired from Roberts that most of the pieces he had purchased as original and genuine Peter Max artwork complete with certificates of authenticity were, in fact, forgeries. This suit arises from this purchase of forged art, correct? That's what this suit is all about, that paragraph right there?

A. I think so, yeah.

Q. Now, you have no personal evidence that

Les Roberts forged any of that, correct?
A. Well, I don't know what more evidence do I need than the American police institution comes to my house and tells me that those are forgeries.
Q. Did they tell you that he forged them?
A. Well, they didn't tell me that he forged them but they told me, Where did I buy them from?
Q. So you personally have no information that he forged them, right?
A. I didn't see him do it.
Q. Nor Sylvia, right?
A. No.
Q. And they didn't tell you that Sylvia and Les Roberts forged them, right? They didn't tell you that?
MR. LORENZEN: Object to the form.
THE WITNESS: No.
BY MR. WANDNER:
Q. All they told you was that the certificates of authenticity were forged, right?
A. And the canvases.
MR. LORENZEN: Object to form.
Q. And the canvases were forged, right?
A. Yeah.
Q. And you have no reason to believe or

evidence to contradict that Les and Sylvia were not aware that they were forged at the time they obtained them and sold them to you, right?

A. I don't care.

Q. You don't care?

A. No, because I'm just asking for retribution for what I bought from a certified Peter Max origin. So I'm not in the business of judging who did them, who didn't do them. I'm just in this lawsuit because I'm being hurt by this operation.

Q. So, in other words, you are not here to say that either one of these either forged this artwork or knew of the forgery? Your complaint is that they sold it, it wasn't real and therefore they owe me the money, right? Is that basically what you are here to say?

A. Well, I think this is a civil case, right?

Q. Right.

A. Well, if this was not a civil case but a legal case, then it was different.

Q. But this case here that we're talking about --

A. This is just a plain case of commercial

retribution.

Q. A breach of contract kind of thing?

A. That would be like a breach of contract and I'm just seeking for my retribution.

Q. And nothing more than that, right?

A. At this point, yes.

Q. Paragraph 30, It is unknown how the forgeries were created. Discovery is required to determine who participated in the forgery process.

That remains the same today, right? Based on your answer, you've learned nothing more about who created the forgeries, right, as we sit here today?

A. As we speak, no.

MR. WANDNER: Let's take a break for two minutes.

(A brief recess was taken, after which the following proceedings were had:)

BY MR. WANDNER:

Q. Is this your signature or your artwork, the maxstore?

A. I made this, yeah.

Q. The same as the Max In The Grove?

A. No. That was done similar to the other Max one.

Q. I think I'm basically done.

Based upon the last couple of questions that we asked and that you answered, candidly I believe, sounds like to me, you would agree based upon your testimony of the last couple of questions and answers about the knowledge issue, you know what I'm talking about, right? If I were to make the following statement to you, Les Roberts and Sylvia Castro Roberts sale to Ed Gugliotta of forged art was knowing and deliberate, you can't say that that's true, right?

MR. LORENZEN: Object to the form.

You can answer.

THE WITNESS: I can say -- let me try to see. I don't know who did it. I cannot say they did it. The only thing I know is that they sold it to me.

BY MR. WANDNER:

Q. And you can't say they did it and you can't say they knew it was forged, right?

A. I can't.

Q. The Robertses provided false certificates of authenticity they created and gave to you. Now, I understand you believe they were false but you cannot say they created it based on

what you just testified; is that true?

A. True.

Q. And finally, the Robertses forged certificates of authenticity from third parties. Based upon your last couple of answers you can't say that's true, correct?

MR. LORENZEN: Object to the form.

THE WITNESS: That's based fundamentally from the FBI report.

BY MR. WANDNER:

Q. Again, you have no personal knowledge that any of that is true?

A. I have no personal knowledge.

MR. WANDNER: That's all I have.

MR. LORENZEN: Okay, I have a few questions.

CROSS EXAMINATION

BY MR. LORENZEN:

Q. Why do you believe that the Robertses forged the certificates?

A. Why do I believe?

Q. Yes.

A. Because when the FBI came to my house they gave me a whole briefing, and they explained exactly what each one of the things made the